IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| W. Clark Aposhian, | : | |
| | : | No. 19-4036 |
| | : | |
| Plaintiff-Appellant, | : | |
| | : | |
| v. | : | |
| | : | |
| William Barr, | : | |
| Attorney General | : | |
| of the United States, et al., | : | |
| | : | |
| | : | |
| Defendants-Appellees. | : | |

PETITION FOR REHEARING *EN BANC*
—————————————————————

INTERLOCUTORY APPEAL FROM THE JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

No. 2:19-cv-00037-JNP
THE HONORABLE JILL N. PARRISH
DISTRICT JUDGE
—————————————————————

June 19, 2020

**NEW CIVIL LIBERTIES ALLIANCE**
**Caleb Kruckenberg**
    Litigation Counsel
**Harriet Hageman**
    Senior Litigation Counsel
**Mark Chenoweth**
    General Counsel
Counsel for Plaintiff-Appellant

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................ ii

TABLE OF AUTHORITIES ................................................................... iii

QUESTIONS PRESENTED .................................................................... 1

RULE 35 STATEMENT ........................................................................... 2

STATEMENT OF THE CASE ................................................................. 5

REASONS FOR GRANTING THE PETITION ....................................... 8

I. THE PANEL MAJORITY DISREGARDED BINDING PRECEDENT BY FORCING *CHEVRON* DEFERENCE ON AN UNWILLING GOVERNMENT AGENCY ............ 8

   A. The Weight of Tenth Circuit Authority Permits Waiver of *Chevron* Deference .................................................................. 9

   B. ATF Argued Against the Application of *Chevron* Deference ....... 11

   C. The Panel Majority Applied *Chevron* Deference Anyway ........... 12

II. THE PANEL MAJORITY DETERMINED THAT *CHEVRON* DEFERENCE ENTIRELY SUPERSEDES THE RULE OF LENITY, CONTRARY TO THIS COURT'S *EN BANC* PRECEDENT AND CONSTITUTIONAL PRINCIPLES ........ 15

   A. This Circuit Applies the Rule of Lenity when Interpreting Criminal Statutes ............................................................................ 15

   B. The Panel Majority Invoked *Chevron* to Supersede the Rule of Lenity ................................................................................................ 17

CONCLUSION ....................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020) .... 7, 8, 9, 11, 12, 13, 14, 15, 17, 18, 19

*Babbitt v. Sweet Home Chapter of Cmties. for a Great Ore.*, 515 U.S. 687 (1995) ................................................................................. 18

*Burrage v. United States*, 571 U.S. 204 (2014) ....................................... 12

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984) ...... 7

*Epic Systems Corp. v. Lewis*, 138 S.Ct. 1612 (2018) .............................. 11

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 S. Ct. 789 (2020) ........................................................................ 11, 12, 17

*Hays Med. Ctr. v. Azar*, 956 F.3d 1247 (10th Cir. 2020) ........ 2, 10, 13, 14

*Hydro Resources, Inc. v. EPA*, 608 F.3d 1131 (10th Cir. 2010) ... 2, 9, 10, 13

*Liparota v. United States*, 471 U.S. 419 (1985) ...................................... 16

*NLRB v. Oklahoma Fixture Co.*, 332 F.3d 1284 (10th Cir. 2003) .... 3, 16, 18, 19

*Skilling v. United States*, 561 U.S. 358 (2010) ....................................... 15

*United States v. Apel*, 571 U.S. 359 (2014) .................................. 2, 12, 15

*United States v. Atandi*, 376 F.3d 1186 (10th Cir. 2004) ...................... 16

*United States v. Davis*, 139 S.Ct. 2319 (2019) ...................................... 17

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ................................ 10

*United States v. Santos*, 553 U.S. 507 (2008) ....................................... 19

*United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020); ................. 2, 10

*Whitman v. United States*, 574 U.S. 1003 (2014) .................................. 17

**Statutes**

18 U.S.C. § 924(a)(2) ............................................................................ 5, 6

18 U.S.C. §§ 922(o) ................................................................................... 6

26 U.S.C. § 5685(b) .................................................................................. 5

26 U.S.C. § 5845(b) .................................................................................. 5

**Other Authorities**

*The Federalist* No. 47, p. 302 (C. Rossiter ed. 1961) (Madison) .............. 3

**Regulations**

*Bump-Stock-Type Devices*, 83 Fed. Reg. 66514 (Dec. 26, 2018) .............. 6

# QUESTIONS PRESENTED

I. May a reviewing court grant *Chevron* deference to an agency's interpretation of a criminal statute over that agency's objection?

II. The rule of lenity requires that any ambiguity concerning the ambit of a criminal statute must be resolved in favor of lenity. Does *Chevron* deference supersede the rule of lenity when evaluating an agency's interpretation of a criminal statute?

# RULE 35 STATEMENT

The panel here vastly expanded the scope of *Chevron* deference. It held that federal courts should defer to an agency's interpretation of a statute, even when the agency does not request deference and affirmatively states that deference is unwarranted. And it held that *Chevron* deference is warranted even when the agency's interpretation of a criminal statute expands the scope of criminal liability, thereby effectively nullifying the rule of lenity.

Both of those holdings warrant *en banc* review by this Court. The decision to apply *Chevron* deference over the objections of the federal government conflicts with decisions of this Court sitting *en banc* and the U.S. Supreme Court. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020); *Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1264 n. 18 (10th Cir. 2020); *Hydro Resources, Inc. v. EPA*, 608 F.3d 1131, 1146 (10th Cir. 2010) (*en banc*). The panel's decision to apply *Chevron* deference with full force in the context of criminal statutes (to the exclusion of the countervailing rule of lenity) similarly conflicts with decisions of both courts. *See United States v. Apel*, 571 U.S. 359, 369 (2014); *NLRB v. Oklahoma Fixture Co.*, 332 F.3d 1284, 1287 (10th Cir.

2003) (*en banc*). The Court should grant *en banc* review to resolve those conflicts.

Review is also warranted because the petition raises issues of exceptional importance. It is a bedrock separation-of-powers principle that those who enforce the criminal laws should not also be entrusted with drafting them. The Founders insisted on the separation of those powers because "there can be no liberty where the legislative and executive powers are united in the same person." *The Federalist* No. 47, p. 302 (C. Rossiter ed. 1961) (Madison). The panel's decision severely tests that principle by deferring to an ATF rule that significantly expands the definition of criminally prohibited "machineguns." It also effectively nullifies the rule of lenity. Indeed, ATF asked the Court not to apply *Chevron* deference precisely because it recognized such deference was unwarranted in the criminal-law context.

This case is a particularly attractive vehicle for addressing the scope of *Chevron* deference because the Court's resolution of the issue is outcome-determinative. The only judge on the panel to construe the statute at issue without placing a thumb on ATF's side of the scale— Judge Carson in his dissenting opinion—concluded that ATF's new

interpretation of a "machinegun" is inconsistent with the statutory language. The panel majority was also unwilling to conclude that ATF's challenged regulation was the best interpretation of the statute. Rather, the majority held no more than that the relevant statutory terms were "ambiguous" and then deferred to ATF's construction of the statute under *Chevron*. In the absence of *Chevron* deference, Appellant W. Clark Aposhian will prevail in his challenge to the ATF regulation.

## STATEMENT OF THE CASE

The Gun Control Act (GCA) and the National Firearms Act (NFA) outlaw the possession of a "machinegun." 18 U.S.C. § 924(a)(2); 26 U.S.C. § 5685(b). A person who violates the prohibition faces up to ten years in federal prison. 18 U.S.C. § 924(a)(2). A "machinegun" is defined by statute. *See* 26 U.S.C. § 5845(b). The Bureau of Alcohol, Tobacco, Firearms and Explosives, which administers and enforces these statutes, has historically determined that "bump stock" devices lacking springs are not "machineguns" and, hence, not prohibited by these statutes. (Aplt. App. at A68, A69.)

A Slide Fire bump stock is "intended to assist persons whose hands have limited mobility to 'bump-fire' an AR-15 type rifle." (Aplt. App. at A69.) "The stock has no automatically functioning mechanical parts or springs and performs no automatic mechanical function when installed." (*Id.*) In reliance on ATF's approval, Mr. Aposhian lawfully purchased a Slide Fire bump stock prior to ATF's efforts to re-classify this plastic accessory as a "machinegun." (Aplt. App. at A67-68.).

Despite its prior determinations, ATF issued a Final Rule on December 26, 2018, which amended the *statutory definition* of a

5

prohibited "machinegun" to include the Slide Fire bump stock. *Bump-Stock-Type Devices*, 83 Fed. Reg. 66514, 66553-54 (Dec. 26, 2018). It was pursuant to this Final Rule that Mr. Aposhian was directed "to destroy the device[] or abandon [it] at an ATF office prior to" "March 26, 2019." *Id*. at 66514, 66555. Had he possessed his bump stock thereafter, he would have faced criminal prosecution and, if convicted, a prison sentence of up to 10 years, as per 18 U.S.C. §§ 922(o), 924(a)(2).

Mr. Aposhian moved to preliminarily enjoin the Final Rule in the district court. ATF responded by "acknowledg[ing] that the irreparable harm prong of the preliminary injunction test is met here," but argued that its new rule was lawful. (Aplt. App. at A106.) The district court denied the injunction, concluding that the Final Rule was the "best interpretation" of what the underlying statute had always meant. (Aplt. App. at A133, A134.)

On appeal to this Court, ATF defended the district court's decision as a matter of statutory interpretation but made two key concessions. First, ATF admitted that it had no legal authority to amend the *statutory definition* of a machinegun but could instead only issue an "interpretive" rule. (*See* Appellee's Br. at 40-41.) Second, ATF argued

that its interpretation of the statute was not entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984). (*See* Appellee's Br. at 36.)

Despite these concessions, a divided panel of this Court affirmed the district court on alternative grounds. *Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020) (Appendix A (slip opinion)). Even after concluding that the Final Rule was in fact a "legislative" *change* to the *statutory definition* of a "machinegun," the majority upheld the rule as a "permissible" gloss on the criminal provision. Appx. A at 14-15, 29. In so doing, the panel overruled ATF's "protest" that it was improper to apply *Chevron* deference to the agency's interpretation, used Mr. Aposhian's argument *against* applying *Chevron* deference as its justification for applying deference and discarded the rule of lenity. *Id.* at 12, 17-18. Judge Carson dissented, rejecting the majority's reframing of the case and its abandonment of circuit precedent. *Id.* at 36.[1]

---

[1] The majority noted that it would affirm the "denial of preliminary injunctive relief" on the alternative ground that "Mr. Aposhian failed to prove he would suffer irreparable harm," even though "the parties did not dispute that Mr. Aposhian will experience irreparable harm if the injunction is denied." *Id.* at 31-32. Judge Carson noted that "the majority's position means that a party with the burden of proof cannot overcome its burden by pointing out that the opposing party conceded

Mr. Aposhian now respectfully petitions for rehearing by the Court, *en banc*.

## REASONS FOR GRANTING THE PETITION

### I. THE PANEL MAJORITY DISREGARDED BINDING PRECEDENT BY FORCING *CHEVRON* DEFERENCE ON AN UNWILLING GOVERNMENT AGENCY

The parties agreed that *Chevron* deference was not appropriate to apply in interpreting a criminal statute. The panel majority's decision to impose *Chevron* deference for interpretation of a criminal statute anyway—against the agency's will—deepens a split within the Tenth Circuit concerning when a government litigant's waiver will be recognized. As Judge Carson noted in his dissenting opinion, the resolution of this case turned on the majority's "appli[cation of] *Chevron* deference to the Bump-Stock Rule." Appx. A at 49. Only by holding that the Final Rule warrants consideration under "the *Chevron* framework" did the majority conclude it to be a "reasonable" gloss on the statute. *Id.*

---

an element of the claim in court," an "alarming" conclusion that "skirts circuit precedent." *Id.* at 53. The Court should not permit the majority's erroneous treatment of "irreparable harm" to prevent *en banc* review of the important deference issues raised by the petition. The Court should correct the substantive errors in the panel's analysis that will inhibit merits review when the case returns to district court for trial.

at 14-15, 31. The panel also had to cast aside the "agreement" of the litigants and the "protest[s]" of ATF itself that *Chevron* analysis was improper. *Id.* at 11-12.

## A. The Weight of Tenth Circuit Authority Permits Waiver of *Chevron* Deference

This Court's precedent, including a prior decision *en banc* and a published opinion issued just days before *Aposhian*, confirms that ATF had the right to waive *Chevron* deference. The majority here disregarded that precedent. This Court should review this case to unmuddy the waters and again clarify that an agency may refuse to invoke a deference doctrine in interpreting a criminal law.

As the panel acknowledged, this Court, sitting *en banc*, has concluded that when an agency "doesn't ask for deference to its statutory interpretation, '[the Court] need not resolve the … issues regarding deference which would be lurking in other circumstances.'" Appx. A at 16 (quoting *Hydro Res., Inc.*, 608 F.3d at 1146). This is because "when a party chooses not to pursue a legal theory potentially available to it, [this Court] generally take[s] the view that it is inappropriate to pursue that theory in our opinions." *Hydro Res., Inc.*, 608 F.3d at 1146 n. 10 (citation omitted).

This "caution" "flows from a recognition of [the Court's] dependence on the adversarial process to test the issues for our decision and from concern for the affected parties to whom we traditionally extend notice and an opportunity to be heard on issues that affect them." *Id.*[2] Moreover, "deference traditionally has been justified, at least in part, on an assumption that the agency in question has 'specialized experience and broader investigations and information available to' it than do judges," but that "expertise" hardly warrants deference when the *agency* has disclaimed reliance on it. *Id.* (quoting *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001)). Panels of this Court, including a decision issued shortly before *Aposhian*, have correctly followed that rule and refused to apply *Chevron* deference when an agency has not adequately sought it. *See Hays Med. Ctr.*, 956 F.3d at 1264 n. 18.

---

[2] As the Supreme Court noted in May, the "principle of party presentation" serves as a fundamental limit on a court's authority. *Sineneng-Smith*, 140 S. Ct. at 1579. "Courts … do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties." *Id.* (citation omitted). The majority instead ignored its fundamental role—assuming control of ATF's litigation strategy and invoking *Chevron* deference against the parties' wishes.

This Court's precedent follows the Supreme Court's approach to waiver. As Justice Gorsuch recently noted in a statement regarding a denial of certiorari in a closely-related challenge to the Final Rule, the Supreme Court "has often declined to apply *Chevron* deference when the government fails to invoke it." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 S. Ct. 789, 790 (2020) (citing authorities). "Nor is it a surprise that the government can lose the benefit of *Chevron* in situations like these and ours. If the justification for *Chevron* is that 'policy choices' should be left to executive branch officials 'directly accountable to the people,' then courts must equally respect the Executive's decision not to make policy choices in the interpretation of Congress's handiwork." *Id.* (quoting *Epic Systems Corp. v. Lewis*, 138 S.Ct. 1612, 1630 (2018)).

## B. ATF Argued Against the Application of *Chevron* Deference

As the majority recognized—the parties agreed that *Chevron* deference had no role to play in this case. Appx. A at 11-12. Indeed ATF "protest[ed]" against the application of *Chevron* deference. *Id.* at 12.

The reason was apparent—to apply *Chevron* deference in a criminal context violated the rule of lenity. In its response to Mr.

Aposhian's motion for a preliminary injunction ATF explained that "agencies are not ordinarily entitled to deference" "in contexts … such as the interpretation of criminal statutes[.]" (Aplt. App. at A103 (citing *Burrage v. United States*, 571 U.S. 204, 216 (2014)). ATF also noted that the Supreme Court has "never held that the Government's reading of a criminal statute is entitled to any deference[.]" *Id.* (quoting *Apel*, 571 U.S. at 369).

### C. The Panel Majority Applied *Chevron* Deference Anyway

The panel sought to side-step this Court's precedent by concluding that "where, like here, a party *other* than the government invokes the *Chevron* framework" it must apply deference over the *government's* objection. Appx. A at 16. This ignores the rationale behind *Chevron*. *Chevron* deference benefits the Executive Branch when it chooses to invoke it. Neither an adverse litigant nor the Court can *compel* deference to the Executive when the Executive declines. The panel majority refused to "respect the Executive's decision not to make policy choices in the interpretation of Congress's handiwork." *See Guedes*, 140 S. Ct. at 790. As Judge Carson noted, by "turning a blind eye to the government's request and applying *Chevron* anyway—the majority

'place[s] an uninvited thumb on the scale in favor of the government.'" Appx. A at 50 (quoting *Guedes*, 140 S. Ct. at 790).

Second, using Mr. Aposhian's pre-emptive attack on *Chevron* as an excuse to apply it is inappropriate. The majority acknowledged its holding has confused the state of the law within the Tenth Circuit, saying this Court's "cases are not entirely consistent as to whether such an invitation is necessary" to apply *Chevron* deference. Appx. A at 17 n. 6 (citing the holding in *Hays Med. Ctr.*, 956 F.3d at 1264 n. 18 that *Chevron* can be waived). The panel suggested that "[t]o the extent that *Chevron* is a standard of review, we would need no invitation to apply it." *Id*. But, of course, this Court already refused to apply *Chevron* deference when the government disclaimed reliance on it, both sitting *en banc* in *Hydro Res., Inc.*, 608 F.3d at 1146, and in *Hays Med. Ctr.*, 956 F.3d at 1264 n. 18. *En banc* review is warranted to resolve the conflict between those binding precedents and the panel's suggestion that *Chevron* deference is a non-waivable standard of review.

The panel decision also relied on a creative understanding of what it means for a party to "invoke[]" the *Chevron* framework, again in conflict with a recent precedential decision. The panel concluded that

Mr. Aposhian "has invoked *Chevron* throughout the course of this litigation" by arguing explicitly that *deference is inappropriate*. Appx. A at 17; *see also* Aplt. Reply Br. at 11 ("This Court should not apply *Chevron* deference to save the final rule from ATF's concessions.").

This approach treats *Chevron* like an amulet that casts a spell just by speaking its name. Thus, the panel majority created an illogical rule that courts may apply *Chevron* deference, even when the government expressly disclaims it, so long as both parties *expressly* disclaim it. Not only is such a rule logically indefensible, it contradicts the published opinion in *Hays Medical Center*. There, the Court rejected an agency's explicit "invo[cation]" of the *Chevron* standard as inadequate, because it was too "threadbare," and thus its "perfunctory and fleeting invocation of *Chevron* waives [its] argument for *Chevron* deference." *Hays Med. Ctr.*, 956 F.3d at 1264 n. 18.

How can the parties faithfully present their issues to the Court in a regime where they must tiptoe around a case's name in order to avoid accidentally tripping its activation by the court? The panel decision here has thrust the role of *Chevron* deference into uncertain and

unpredictable waters. The Court should *grant en banc* review to clarify this issue by resolving the conflict among its decisions.

## II. THE PANEL MAJORITY DETERMINED THAT *CHEVRON* DEFERENCE ENTIRELY SUPERSEDES THE RULE OF LENITY, CONTRARY TO THIS COURT'S *EN BANC* PRECEDENT AND CONSTITUTIONAL PRINCIPLES

The panel majority also contradicted circuit and Supreme Court precedent by elevating the "controversial doctrine" of *Chevron* deference over the constitutionally-required rule of lenity. *See* Appx. A at 14-15 (Carson, J., dissenting). ATF "protest[ed]" against deference for a reason—a prosecutor's interpretation of a criminal law like the statute banning machineguns is not entitled to any deference. *See Apel*, 571 U.S. at 369 ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference.").

### A. This Circuit Applies the Rule of Lenity when Interpreting Criminal Statutes

The rule of lenity is constitutionally required and dictates that any "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Skilling v. United States*, 561 U.S. 358, 410 (2010). "Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor,

and the court in defining criminal liability." *Liparota v. United States*, 471 U.S. 419, 427 (1985).

The conflict between the rule of lenity and *Chevron* deference hardly presents a new question for this Court. This Court, sitting *en banc*, has taken a middle path, acknowledging that "'some degree of deference' is owed to an agency's interpretation of a criminal provision," although that deference cannot be "in conflict with interpretive norms regarding criminal statutes." *Oklahoma Fixture*, 332 F.3d at 1287. This includes the "general rule of statutory interpretation that criminal statutes must be construed narrowly, and that exceptions to those statutes must be construed broadly." *Id*. at 1287 n. 6. Subsequent panels of this Court have reaffirmed that this Court gives "some deference" to regulations with criminal consequences, but it also tempers that deference by applying "interpretive norms for criminal statutes." *United States v. Atandi*, 376 F.3d 1186, 1189 (10th Cir. 2004).

This precedent preserves the rule of lenity as a guiding force because to cast it aside entirely would be an affront to constitutional principles. As Judge Carson said, "Suffice to say that when, as here, a

law carries both civil and criminal consequences, applying *Chevron* can lead to troubling and unintended outcomes." Appx. A at 51.

Justice Gorsuch has flatly declared, "[W]hatever else one thinks about *Chevron*, it has no role to play when liberty is at stake." *Guedes*, 140 S. Ct. at 790. "Under our Constitution, '[o]nly the people's elected representatives in the legislature are authorized to 'make an act a crime.'" *Id.* (quoting *United States v. Davis*, 139 S.Ct. 2319, 2325 (2019)). He cautioned, "Before courts may send people to prison, we owe them an independent determination that the law actually forbids their conduct." *Id.* Deferring to an agency's interpretation of a criminal law subverts the rule of lenity's guarantee of "fair warning" and "the principle that only the legislature may define crimes and fix punishments." *Whitman v. United States*, 574 U.S. 1003, 1003 (2014) (Scalia, J., statement regarding denial of certiorari).

## B. The Panel Majority Invoked *Chevron* to Supersede the Rule of Lenity

The panel majority eviscerated the rule of lenity, in conflict with understandings of that rule embraced both by this Court sitting *en banc* (in *Oklahoma Fixture*) and the Supreme Court (in *Apel*). It deferred to a prosecutor's *current* reading of a long-standing criminal law despite the

profound constitutional implications of doing so. After concluding that the statute was "ambiguous," the panel majority held that "*Chevron, not the rule of lenity, should apply.*" Appx A. at 19, 23 (emphasis added). In the process, the panel expanded criminal liability for Americans who might run afoul of what the Court concedes is nothing more than a "permissible" reading of a criminal law, and one that the *Court* imposed upon a prosecuting agency against its will. *See id.* at 29.

To avoid circuit precedents concerning the role that the rule of lenity must play, the panel insisted that the Supreme Court's treatment of *Chevron* deference in in *Babbitt v. Sweet Home Chapter of Cmties. for a Great Ore.*, 515 U.S. 687, 704 n. 18 (1995), had foreclosed all application of the rule of lenity in agency interpretation. *Id.* at 22. But the *en banc* Court was well aware of *Babbitt* when it held that the rule of lenity still has a role to play; it cited that decision in *support* of its determination that *both Chevron* deference and core interpretive norms regarding criminal statutes must come into play. *See Oklahoma Fixture*, 332 F.3d at 1287. The panel majority is not entitled to disregard how this Court previously interpreted the *Babbitt* footnote.

The panel majority also said that "contrary to Mr. Aposhian's assertion, the majority in *Oklahoma Fixture* did not apply, or even mention, the rule of lenity." Appx. A at 20. The majority's characterization is inaccurate. *Oklahoma Fixture* held that *Chevron* deference may not be applied "in conflict with interpretive norms regarding criminal statutes." 332 F.3d at 1287. The rule of lenity, of course, is a "venerable" interpretive rule that "vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed." *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality op.). And lest there be any confusion about what those "interpretive norms" entail, several members of the Court in *Oklahoma Fixture* argued that the "rule of lenity" should "come[] into play … since we are dealing with an ambiguous term in a criminal statute." 332 F.3d at 1292 (Briscoe, J., concurring).

The panel rendered the rule of lenity entirely subservient to *Chevron* deference. The holding conflicts not only with *Oklahoma Fixture* but also with decisions of the Supreme Court, including *Apel*. In the process, the panel created a dangerous and unconstitutional

consolidation of power in the Executive branch. This Court should grant rehearing to restore the rule of lenity.

## **<u>CONCLUSION</u>**

This Court should grant rehearing *en banc*.

June 19, 2020

Respectfully,

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**
Litigation Counsel
**Harriet M. Hageman**
Senior Litigation Counsel
**Mark Chenoweth**
General Counsel
New Civil Liberties Alliance

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this document complies with Federal Rule of Appellate Procedure 35(b)(2)(A). It is printed in Century Schoolbook, a proportionately spaced font, and includes 3647 words, excluding items enumerated in Rule 32(f). I relied on my word processor, Microsoft Word, to obtain the count.

I hereby certify that all required privacy redactions have been made pursuant to 10th Cir. R. 25.5, any required paper copies to be submitted to the Court are exact copies of the version submitted electronically, and the electronic submission was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.

Respectfully,

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
caleb.kruckenberg@ncla.legal
(202) 869-5210
Counsel for Plaintiff-Appellant

## CERTIFICATE OF SERVICE

I hereby certify that the original and any required hard copies were mailed by Federal Express, next-day delivery, to the Clerk of the Court at the Byron White U.S. Courthouse, 1823 Stout St., Denver, Colorado 80257 on June 19, 2020. This document was electronically filed using the Tenth Circuit's CM/ECF system, which sent notification of such filing to all counsel of record.

Respectfully,

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
caleb.kruckenberg@ncla.legal
(202) 869-5210
Counsel for Plaintiff-Appellant

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| W. Clark Aposhian, | : | |
| | : | No. 19-4036 |
| | : | |
| Plaintiff-Appellant, | : | |
| | : | |
| v. | : | |
| | : | |
| William Barr, | : | |
| Attorney General | : | |
| of the United States, et al., | : | |
| | : | |
| | : | |
| Defendants-Appellees. | : | |

PETITION FOR REHEARING *EN BANC*
**APPENDIX A**
PANEL OPINION

_____

INTERLOCUTORY APPEAL FROM THE JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

No. 2:19-cv-00037-JNP
THE HONORABLE JILL N. PARRISH
DISTRICT JUDGE

_____

FILED
United States Court of Appeals
Tenth Circuit

May 7, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

W. CLARK APOSHIAN,

      Plaintiff - Appellant,

v.

WILLIAM BARR, Attorney General of the
United States; UNITED STATES
DEPARTMENT OF JUSTICE; THOMAS
E. BRANDON, Acting Director Bureau of
Alcohol Tobacco Firearms and Explosives;
BUREAU OF ALCOHOL TOBACCO
FIREARMS AND EXPLOSIVES,

      Defendants - Appellees.

------------------------------

CATO INSTITUTE AND FIREARMS
POLICY COALITION; DUE PROCESS
INSTITUTE,

      Amicus Curiae.

No. 19-4036

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:19-CV-00037-JNP-BCW)**

_____

Caleb Kruckenberg, Litigation Counsel (Steve Simpson and Harriet Hageman, Senior
Litigation Counsel; and Mark Chenoweth, General Counsel, with him on the briefs), New
Civil Liberties Alliance, Washington, DC, appearing for Appellant.

Brad Hinshelwood, Attorney, Civil Division, United States Department of Justice,
Washington, DC (Joseph H. Hunt, Assistant Attorney General, Civil Division, United

States Department of Justice, Washington, DC; John W. Huber, United States Attorney, Office of the United States Attorney for the District of Utah, Salt Lake City, Utah; Mark B. Stern, Michael S. Raab, and Abby C. Wright, Attorneys, Civil Division, United States Department of Justice, Washington, DC, with him on the briefs), appearing for Appellees.

Ilya Shapiro, Washington, DC, for Amicus Curiae Cato Institute.

John D. Cline, San Francisco, California, for Amicus Curiae Due Process Institute.

_____

Before **BRISCOE**, **MORITZ**, and **CARSON**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

Plaintiff-Appellant W. Clark Aposhian has filed an interlocutory appeal from the district court's denial of his motion for a preliminary injunction. The district court concluded that Mr. Aposhian had not shown a likelihood of success on the merits of his challenge to a rule promulgated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) that classifies bump stocks as machine guns under the National Firearms Act (NFA), 26 U.S.C. §§ 5801–5872. *See* Bump-Stock-Type Devices, 83 Fed. Reg. 66,514 (Dec. 26, 2018) (Final Rule). The Final Rule was promulgated to clarify the definition of "machinegun" as found in 26 U.S.C. § 5845(b).[1] It is that definition of machine gun and the Final Rule that are the focus of this appeal. Exercising jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), we agree with the outcome reached by the district court that Mr. Aposhian has failed to establish a likelihood of success on the merits of his challenge to the Final Rule, and we affirm the denial of preliminary injunctive relief.

_____

[1] We use the two-word spelling of machine gun except when quoting sources.

2

# I

*Statutory Framework*

The NFA (i) regulates the production, dealing in, possession, transfer, import, and export of covered firearms; (ii) creates a national firearms registry; and (iii) imposes taxes on firearms importers, manufacturers, and dealers, as well as specified transfers of covered firearms. 26 U.S.C. §§ 5801–5861. Failure to comply with the NFA's requirements results in penalties and forfeiture and subjects the violator to the general enforcement measures available under the internal revenue laws. *Id.* §§ 5871–5872.

"Machinegun[s]" are subject to regulation and registration under the NFA. *Id.* § 5845(a). The NFA defines a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." *Id.* § 5845(b). The definition also includes "the frame or receiver of any such weapon," as well as "any part" or "combination of parts designed and intended, for use in converting a weapon into a machinegun," and "any combination of parts from which a machinegun can be assembled" as long as those "parts are in the possession or under the control of a person." *Id.*

Congress expressly charged the Attorney General with the "administration and enforcement" of the NFA, *id.* § 7801(a)(1), (a)(2)(A), and provided that the Attorney General "shall prescribe all needful rules and regulations for the enforcement of" the NFA, *id.* § 7805; *see id.* § 7801(a)(2)(A).

The Gun Control Act of 1968 (GCA), 18 U.S.C. § 921 et seq., as amended by the Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986), imposes both criminal prohibitions and a regulatory licensing scheme on certain firearm transactions. *See* 18 U.S.C. § 922 (criminal prohibitions); *id.* § 923 (licensing scheme).  The GCA incorporates by reference the definition of machine gun in the NFA.  *See id.* § 921(a)(23). The GCA also expressly delegates administrative and rulemaking authority to the Attorney General to "prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter."  *Id.* § 926(a).  The Attorney General has delegated the responsibility for enforcing and administering the NFA and the GCA to ATF.  *See* 28 C.F.R. § 0.130(a).

Under 18 U.S.C. § 922(o), it is "unlawful for any person to transfer or possess a machinegun."  Conversely, many firearms requiring a distinct pull of the trigger to shoot each bullet are lawful.  *See generally id.* § 922; 26 U.S.C. § 5845. Over time, ATF has promulgated regulations and issued rulings defining various terms in the NFA and GCA and classifying weapons and parts as machine guns.

*Regulation of Bump Stocks*

A "bump stock" is a device that replaces the standard stationary stock of a semiautomatic rifle—the part of the rifle that generally rests against the shooter's shoulder—with a sliding, non-stationary stock that permits the shooter to rapidly increase the rate of fire, approximating that of an automatic weapon.  Final Rule at 66,516.  A bump stock does so by channeling the recoil energy from each shot "into the space created by the sliding stock (approximately 1.5 inches) in constrained linear rearward and

4

forward paths." *Id.* at 66,518. The bump stock "harnesses the firearm's recoil energy as part of a continuous back-and-forth cycle that allows the shooter to attain continuous firing" following a single pull of the trigger, producing a rapid bumping of the trigger against the shooter's stationary finger. *Id.* at 66,533. That design allows the shooter, by maintaining constant rearward pressure on the device's extension ledge[2] with the trigger finger as well as forward pressure on the front of the gun, to fire bullets continuously and at a high rate of fire to "mimic automatic fire." *Id.* at 66,516. This continuous cycle of fire-recoil-bump-fire lasts until the shooter releases the trigger by removing his finger from the extension ledge, the weapon malfunctions, or the ammunition is exhausted. *Id.* at 66,519.

The Attorney General, exercising his regulatory authority, first included a bump stock device—the Akins Accelerator—within the statutory definition of "machinegun" in 2006. *See* ATF Ruling 2006-2; *see also Akins v. United States*, 312 F. App'x 197, 199 (11th Cir. 2009). The Akins Accelerator, unlike many bump stocks, used "an internal spring" to "reposition and refire" the firearm. *Akins*, 312 F. App'x at 198. ATF later limited the devices it defined as machine guns by concluding that bump stocks that operated without an internal spring were not machine guns. Final Rule at 66,514.

On October 1, 2017, a shooter in Las Vegas, Nevada, used multiple semiautomatic rifles equipped with bump stocks to fire several hundred rounds of ammunition into a

---

[2] The extension ledge or "finger rest" is where the "shooter places the trigger finger while shooting the firearm." Final Rule at 66,516.

crowd of concert attendees within a short period of time. *Id.* at 66,516.[3] The "'rapid fire' operation" of the shooter's weapons enabled by the bump stocks left 58 dead and approximately 500 wounded. *Id.* In response, President Trump directed the Department of Justice "to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns." Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, 83 Fed. Reg. 7,949, 7,949 (Feb. 20, 2018). ATF then revisited the status of bump stocks, reviewed its earlier determinations for bump-stock-type devices issued between 2008 and 2017, and decided to clarify by the rulemaking process the statutory terms "automatically" and "single function of the trigger" as applied in defining what is or is not a machine gun. Final Rule at 66,514–66,515. On March 29, 2018, then-Attorney General Sessions issued a Notice of Proposed Rulemaking that suggested "amend[ing] the [ATF] regulations to clarify that [bump stocks] are 'machineguns'" under 26 U.S.C. § 5845(b). *See* Bump-Stock-Type Devices, 83 Fed. Reg. 13,442 (March 29, 2018).

ATF promulgated its Final Rule on December 26, 2018. Regarding the statutory definition of machine gun, the Final Rule provided that the NFA's use of "the term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,'" 26 U.S.C. § 5845(b), "means functioning as the result of a self-acting or self-

---

[3] Because ATF had not regulated certain types of bump stocks under the NFA or GCA, they were not marked with a serial number or other identification markings. As a result, individuals were able to legally purchase bump stocks without undergoing background checks or complying with any other federal regulations applicable to firearms. Final Rule at 66,516.

6

regulating mechanism that allows the firing of multiple rounds through a single function of the trigger."  Final Rule at 66,553–66,554 (codified at 27 C.F.R. §§ 447.11, 478.11, 479.11).  The Final Rule further defined "single function of the trigger," 26 U.S.C. § 5845(b), to mean "a single pull of the trigger and analogous motions."  Final Rule at 66,553–66,554 (codified at 27 C.F.R. §§ 447.11, 478.11, 479.11).

Given those definitions, the Final Rule concluded that the statutory term "'machinegun' includes a bump-stock-type device"—that is, "a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter."  *Id.* (codified at 27 C.F.R. §§ 447.11, 478.11, 479.11).

For its authority to promulgate the Final Rule, ATF relied on both the "plain meaning" of the NFA and the Attorney General's delegation to the agency to administer and enforce the NFA and GCA.  *Id.* at 66,527.  In addition, ATF stated that if 26 U.S.C. § 5845(b) is ambiguous, the Final Rule "rests on a reasonable construction."  *Id.* (citing and invoking *Chevron U.S.A., Inc. v. Nat. Res. Def. Counsel*, 476 U.S. 837 (1984)).  ATF explained that although Congress defined "machinegun" in the NFA, "it did not further define the components of that definition . . . Congress thus implicitly left it to the [Attorney General] to define 'automatically' and 'single function of the trigger' in the event those terms are ambiguous."  *Id.*

ATF stated that the Final Rule would become "effective" on March 26, 2019, ninety days after promulgation.  *Id.* at 66,514.  ATF stated further that individuals would

7

be subject to "criminal liability only for possessing bump-stock-type devices after the effective date of regulation, not for possession before that date." *Id.* at 66,525. Bump-stock owners were directed to destroy their devices or leave them at an ATF office by March 26, 2019. *Id.* at 66,514.

*Procedural History*

Mr. Aposhian purchased a Slide Fire bump stock before the Final Rule was promulgated. He filed suit against various governmental officers and agencies challenging the Final Rule as unconstitutional and in violation of the Administrative Procedure Act (APA), arguing that the Final Rule contradicts an unambiguous statute, 26 U.S.C. § 5845(b), and mistakenly extends its statutory definition of "machinegun" to cover bump stocks. The government also argued the statute is unambiguous but that the Final Rule is merely interpretive and, as so, reflects the best interpretation of the statutory text. For its part, the district court did not specifically opine on whether the statute was ambiguous or not.

Ultimately, the district court denied Mr. Aposhian's motion for a preliminary injunction, concluding that because the Final Rule represented the best reading of the statute, Mr. Aposhian was not likely to succeed on the merits of his challenge. Aplt. App. at 181. Because it concluded that Mr. Aposhian was unlikely to succeed on the merits, the district court did not reach the other three preliminary-injunction factors. *See id.* at 175. Mr. Aposhian filed a notice of appeal and sought an injunction pending appeal from this court, which was denied. *Id.* at 226.

8

**II**

We review the district court's denial of a preliminary injunction for abuse of

discretion. *Wilderness Workshop v. BLM*, 531 F.3d 1220, 1223 (10th Cir. 2008). "An

abuse of discretion occurs 'only when the trial court bases its decision on an erroneous

conclusion of law or where there is no rational basis in the evidence for the ruling.'"

*Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1065 (10th Cir. 2001) (quoting

*Hawkins v. City and Cty. of Denver*, 170 F.3d 1281, 1292 (10th Cir. 1999)). "Thus, we

review the district court's factual findings for clear error and its conclusions of law de

novo." *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016).

"A preliminary injunction is an extraordinary remedy, the exception rather than

the rule." *United States ex rel. Citizen Band Potawatomi Indian Tribe v. Enter. Mgmt.*

*Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989). "To obtain a preliminary

injunction, the movant must show: (1) a substantial likelihood of success on the merits;

(2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury

outweighs the harms that the preliminary injunction may cause the opposing party; and

(4) the injunction, if issued, will not adversely affect the public interest." *Gen. Motors*

*Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). The third and fourth

factors "merge" when, like here, the government is the opposing party. *Nken v. Holder*,

556 U.S. 418, 435 (2009). "[B]ecause a preliminary injunction is an extraordinary

remedy, the [movant's] right to relief must be clear and unequivocal." *Dominion Video*

*Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004) (internal

quotation marks omitted).

### III

To obtain preliminary injunctive relief, Mr. Aposhian must demonstrate a substantial likelihood of success on the merits of his challenge to the Final Rule. While his complaint raises both constitutional and APA claims, he does not cite to any constitutional provision or section of the APA in the portion of his opening brief discussing his likelihood of success on the merits. It is clear, however, that Mr. Aposhian's merits arguments in this court concern only issues of statutory interpretation. Specifically, he contends that he has demonstrated a substantial likelihood of success on the merits because ATF's interpretation of 26 U.S.C. § 5845(b) contradicts the unambiguous language of the statute. Aplt. Br. at 13. He also argues that because the statute is unambiguous, ATF had no authority to promulgate a rule defining its terms. *Id.* at 30. In the alternative, Mr. Aposhian contends that any ambiguity in the statute must be construed in his favor under the rule of lenity.[4] *Id.* at 37.[5]

Because Mr. Aposhian is challenging ATF's authority to promulgate the Final Rule, the APA governs our review. *See WildEarth Guardians v. United States Fish and*

---

[4] Under the rule of lenity, courts "interpret ambiguous statutes . . . in favor of criminal defendants." *United States v. Gay*, 240 F.3d 1222, 1232 (10th Cir. 2001). "The rule of lenity 'is a rule of last resort [and] the mere assertion of an alternative interpretation is not sufficient to bring the rule into play.'" *Id.* (quoting *United States v. Blake*, 59 F.3d 138, 140 (10th Cir. 1995)).

[5] Mr. Aposhian states in a footnote in his reply brief that his "claim is that the Final Rule was issued in violation of Articles I, § 1, I, §7, and II, § 3, on theories related to the vesting clauses, bicameralism and presentment, non-divestment and separation of powers principles." Aplt. Rep. Br. at 27 n.1 (citing his complaint). Not only does Mr. Aposhian fail to cite any caselaw supporting these arguments, these constitutional theories are absent from his opening brief. We routinely "decline[] to consider arguments

*Wildlife Serv.*, 784 F.3d 677, 683 (10th Cir. 2015) (noting that the APA applies "when asking whether an agency has acted within its authority"); *see also Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (stating that the APA "governs judicial review of agency actions"). As relevant to the arguments here, we may only set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). We conclude that Mr. Aposhian has not shown that ATF acted beyond its authority and has thereby failed to demonstrate a substantial likelihood of success under the APA.

## A

At the outset, we must determine what standard we are to apply in addressing the Final Rule's conclusion that bump stocks are "machineguns" under the statutory definition. When confronted with this question of statutory interpretation and what if any weight the district court should accord ATF's interpretation under its Final Rule, the parties seemed oddly in agreement. Mr. Aposhian argued repeatedly against the application of *Chevron* deference, citing *Chevron* in his motion for a preliminary injunction to argue that ATF's construction of the statute should be rejected, Aplt. App. at 44–45, and devoting the entirety of his reply brief to argue the Final Rule fails under both step one and step two of *Chevron*, *see id.* at 111–19. And, as the district court noted

---

that are not raised, or are inadequately presented, in an appellant's opening brief," *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007)), and it is well settled that we do not ordinarily review issues raised for the first time in a reply brief, *Sylvia v. Wisler*, 875 F.3d 1307, 1332 n.7 (10th Cir. 2017). We see no reason to deviate from those principles here.

in its memorandum opinion and order denying the motion for a preliminary injunction, the government "went out of [its] way to avoid citing *Chevron* and its progeny and repeatedly stressed that [the defendants] neither request, nor believe their interpretations are entitled to, any measure of deference." *Id.* at 177 n.8.  In the end, the district court did not apply the *Chevron* framework.  *Id.*  Rather, it concluded that the Final Rule represented the best interpretation of the statute.  *Id.* at 181.

Generally, however, "we apply the test established by *Chevron* . . . when asking whether an agency has acted within its authority." *WildEarth*, 784 F.3d at 683 (emphasizing that appellate review under APA § 706(2)(C) proceeds under the *Chevron* framework).  If *Chevron* applies, we first ask if the statute is ambiguous concerning whether bump stocks can be considered "machineguns."  If so, we sustain the Final Rule's conclusion that bump stocks are machine guns as long as the Final Rule's conclusion is reasonable.  *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009).  At this second step, an "agency need not adopt . . . the best reading of the statute, but merely one that is permissible." *Dada v. Mukasey*, 554 U.S. 1, 29 n.1 (2008).  On the other hand, if *Chevron*'s two-step framework is inapplicable, we accept ATF's interpretation only if it is the best reading of the statute.  While the parties protest the applicability of *Chevron* on various grounds, we conclude that the Final Rule warrants consideration under the *Chevron* framework.

**(i)**

Initially, the applicability of *Chevron* depends on what kind of rule the Final Rule represents.  There is a "central distinction" under the APA between legislative rules and

12

interpretive rules. *Chrysler Corp. v. Brown*, 441 U.S. 281, 301 (1979); *see* 5 U.S.C.

§ 553(b), (d).  Legislative rules generally receive *Chevron* deference, whereas

interpretive rules "enjoy no *Chevron* status as a class." *United States v. Mead Corp.*, 533

U.S. 218, 232 (2001).

A legislative rule is one that "is promulgated pursuant to a direct delegation of

legislative power by Congress and . . . changes existing law, policy, or practice." *Rocky

Mountain Helicopters, Inc. v. F.A.A.*, 971 F.2d 544, 546 (10th Cir. 1992).  A legislative

rule affects individual rights and obligations, and, if it is "the product of certain

procedural requisites," it has the force and effect of law. *Chrysler Corp.*, 441 U.S. at

301–02.  An interpretive rule, on the other hand, "attempts to clarify an existing rule but

does not change existing law, policy, or practice." *Rocky Mountain Helicopters*, 971

F.2d at 546–47.  An interpretive rule simply "'advise[s] the public of the agency's

construction of the statute and rules which it administers.'" *Sorenson Commc'ns, Inc. v.

F.C.C.*, 567 F.3d 1215, 1222 (10th Cir. 2009) (quoting *Shalala v. Guernsey Mem. Hosp.*,

514 U.S. 87, 99 (1995)).

The government contends—and the district court found—that the Final Rule is

merely interpretive.  *See* Aple. Br. at 37–38; Aplt. App. at 176.  But "[t]he agency's own

label for its action is not dispositive." *Sorenson*, 567 F.3d at 1223.  Instead, "[t]he court

must rely upon the reasoning set forth in the administrative record and disregard *post hoc*

rationalizations of counsel." *Id.* at 1221.  Here, "[a]ll pertinent indicia of agency intent

confirm that the [Final] Rule is a legislative rule." *Guedes v. Bur. of Alcohol, Tobacco,*

*Firearms & Explosives*, 920 F.3d 1, 18 (D.C. Cir. 2019) (reviewing the Final Rule under the *Chevron* framework).

First, the Final Rule demonstrates that ATF intended to change the legal rights and obligations of bump-stock owners. The Final Rule directed bump-stock owners to either destroy or surrender to ATF any bump stock in their possession and stated that "[t]he rule would criminalize only future conduct, not past possession of bump-stock-type devices that ceases by the effective date of this rule." Final Rule at 66,525. The Final Rule announced that a person "in possession of a bump-stock-type device" in fact "*is not acting unlawfully* unless they fail to relinquish or destroy their device *after* the effective date of this regulation." *Id.* at 66,523 (emphasis added). This effort to "'directly govern[] the conduct of members of the public, affecting individual rights and obligations'" is "powerful evidence" that ATF intended the Final Rule to be a binding application of its rulemaking authority. *Guedes*, 930 F.3d at 18 (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 172 (2007)).

ATF, when promulgating the Final Rule, "further evinced its intent to exercise legislative authority by expressly invoking the *Chevron* framework and then elaborating at length as to how *Chevron* applies to the [Final] Rule." *Id.* at 18–19 (noting that ATF's "exegesis" on *Chevron* "would have served no purpose unless the agency intended the [Final] Rule to be legislative in character"). Moreover, the Final Rule expressly invoked two separate delegations of legislative power, one under the NFA, 26 U.S.C. § 7805, and one under the GCA, 18 U.S.C. § 926(a). *See* Final Rule at 66,515. These provisions,

14

according to the Final Rule, give the Attorney General "the responsibility for administering and enforcing the NFA and GCA," which he has delegated to ATF. *Id.*

In addition, the Final Rule was published in the Code of Federal Regulations (CFR). By statute, administrative rules published in the CFR are limited to those "having general applicability and legal effect." 44 U.S.C. § 1510. For all of these reasons, it is evident that the Final Rule intends to speak with the force of law.

Ordinarily, legislative rules are entitled to *Chevron* deference. *See Sinclair Wyoming Refining Co. v. EPA*, 887 F.3d 986, 991 (10th Cir. 2017). Nonetheless, the parties assert that *Chevron* deference is inappropriate here. Mr. Aposhian argues that *Chevron* deference has been waived by the government because the government has disavowed any reliance on *Chevron* throughout this litigation. Aplt. Br. at 42–43. Next, the parties (including the government) submit that *Chevron* deference is inapplicable when the government interprets a statute that imposes criminal liability. *See* Aplt. Br. at 44; Aple. Br. at 40. Neither of these objections to applying *Chevron* are likely to succeed in the context of the Final Rule, particularly when one recalls the citation to and reliance on *Chevron* when the Final Rule was promulgated.

**(ii)**

Mr. Aposhian relies on our decision in *Hydro Resources, Inc. v. EPA*, 608 F.3d 1131 (10th Cir. 2010), to argue that the government has waived any reliance on *Chevron* deference and that we must abide by that waiver. Aplt. Br. at 42, 43. In *Hydro Resources*, we reviewed de novo the Environmental Protection Agency's interpretation of a statute because "throughout the proceedings before the panel and . . . the *en banc* court,

15

[the agency] itself ha[d]n't claimed any entitlement to deference." *Id.* at 1146. We noted that "[i]n these circumstances, when the agency doesn't ask for deference to its statutory interpretation, 'we *need not* resolve the . . . issues regarding deference which would be lurking in other circumstances.'" *Id.* (emphasis added) (quoting *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992)). However, this passage should not be read as prohibiting our application of *Chevron* merely on the agency's say so. Simply put, "need not" does not mean "may not." Moreover, *Hydro Resources* did not address a scenario where, like here, a party *other* than the government invokes the *Chevron* framework.

We addressed this specific scenario in *TransAm Trucking, Inc. v. Admin. Review Bd.*, 833 F.3d 1206, 1212 n.4 (10th Cir. 2016), and held that the *Chevron* framework applies, including deference at *Chevron* step two. The dissent in *TransAm* criticized the majority for making "a wholly uninvited foray into step two of *Chevron* land," *id.* at 1216 (Gorsuch, J., dissenting), because "the only party to mention *Chevron* . . . was [the plaintiff], and then only in a footnote in its brief and then only as part of an argument that the statute is *not* ambiguous," *id.* (emphasis in original). The majority nonetheless applied both steps of *Chevron* and gave the agency's interpretation of the statute deference, *id.* at 1212, defending its application of *Chevron* deference by stating, "We received our invitation from TransAm [to apply the *Chevron* framework] in its opening brief . . . TransAm, the appellant in this matter, relied on *Chevron* to argue the [agency's] construction of the [statute] should be rejected." *Id.* at n.4.

16

This case is akin to *TransAm*.  While the government has declined to invoke *Chevron* throughout the course of this litigation, *see* Aple. Br. at 16 (arguing that "plaintiff's discussion of *Chevron* deference has no bearing on the disposition of this suit"), Mr. Aposhian, like the plaintiff in *TransAm*, relies on *Chevron* in his opening brief to argue that ATF's construction of the statute should be rejected.  In contending that ATF's interpretation "contradicts the statute itself," Aplt. Br. at 13 (capitalization omitted), Mr. Aposhian cites *Chevron*, arguing that the inquiry is whether the statute "'has directly spoken to the precise question at issue,' and, if so, 'that is the end of the matter; for the court as well as the agency must give effect to the unambiguously expressed intent of Congress,'" *id.* at 14 (quoting *Chevron*, 467 U.S. at 842–43).  The plaintiff in *TransAm* likewise cited *Chevron* "as part of an argument that the statute is *not* ambiguous" (*Chevron* step one), 833 F.3d at 1216 (Gorsuch, J., dissenting), yet the majority still concluded that the plaintiff provided an "invitation" to apply both steps of the *Chevron* framework, *id.* at 1212 n.4.  Our "invitation" to apply the *Chevron* framework in this case is even clearer than in *TransAm*, given that Mr. Aposhian (1) cites *Chevron* in the text of his opening brief rather than in a footnote; and (2) relied on *Chevron* in his motion for a preliminary injunction at the district court, Aplt. App. at 44–45, and in his motion for an injunction pending appeal, *id.* at 150.  Because Mr. Aposhian has invoked *Chevron* throughout the course of this litigation, his objection to *Chevron* deference based on the *government's* waiver is unlikely to succeed.[6]

---

[6] While Mr. Aposhian has clearly presented an "invitation" to apply the *Chevron* framework under *TransAm*, we note that our cases are not entirely consistent as to

17

**(iii)**

Next, the parties contend that *Chevron* deference is inapplicable where the government interprets a statute that imposes criminal liability. *See* Aplt. Br. at 44 ("'[C]riminal laws are for courts, not for the Government, to construe.'") (quoting *Abramski v. United States*, 573 U.S. 169, 191 (2014)); Aple. Br. at 40 (same). According to Mr. Aposhian, "ATF's rejection of deference in favor of the rule of lenity" is required by our precedent and constitutional limitations. Aplt. Br. at 44. Mr. Aposhian also relies on *United States v. Apel*, 571 U.S. 359, 369 (2014), for the proposition that "we have never held that the Government's reading of a criminal statute is entitled to any deference." Mr. Aposhian, however, has failed to demonstrate a likelihood of success in establishing a general rule against applying *Chevron* to agency interpretations of statutes with criminal law implications. Rather, controlling precedent points in the other direction.

In *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995), the Supreme Court reviewed a regulation interpreting a term in the

---

whether such an invitation is necessary. *Compare Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1187 (10th Cir. 2016) (describing *Chevron* as a "two-part *standard of review*") (emphasis added), *with Hays Med. Ctr. v. Azar*, --- F.3d ---, No. 17-3232, 2020 WL 1922595, at *13 n.18 (10th Cir. Apr. 21, 2020) (concluding that *Chevron* can be waived where, unlike here, its "invocation" is merely "perfunctory and fleeting"). To the extent that *Chevron* is a standard of review, we would need no invitation to apply it. *See Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009) ("It is one thing to allow parties to forfeit claims, defenses, or lines of argument; it would be quite another to allow parties to stipulate or bind us to application of an incorrect legal standard . . . ."); *see also Guedes*, 920 F.3d at 22 ("The 'independent power' to identify and apply the correct law presumably includes application of the *Chevron* framework when determining the meaning of a statute.").

18

Endangered Species Act (ESA), which, like the regulation in this case, carried both civil and criminal implications.  The challengers argued that *Chevron* deference was inappropriate because the ESA included criminal penalties.  *See id.* at 704 n.18.  The Court disagreed, holding that it would defer "to the Secretary's reasonable interpretation" under *Chevron*.  *Id.* at 703–04.

Babbitt also rejected the argument "that the rule of lenity should foreclose any deference to the [agency's] interpretation of the [statute] because the statute includes criminal penalties."  *Id.* at 704 n.18.  The Court reasoned,

> The rule of lenity is premised on two ideas: First, "'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed'"; second, "legislatures and not courts should define criminal activity."  We have applied the rule of lenity in a case raising a narrow question concerning the application of a statute that contains criminal sanctions to a specific factual dispute—whether pistols with short barrels and attachable shoulder stocks are short-barreled rifles— *where no regulation was present.  See United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517–518, and n. 9, (1992). We have *never* suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative *regulations* whenever the governing statute authorizes criminal enforcement.

*Id.* (emphasis added) (citation omitted).  Thus, as in this case, where a regulation *is* at issue, *and* the agency (here, ATF) has both civil and criminal enforcement authority, *Babbitt* suggests that *Chevron*, not the rule of lenity, should apply.

Our circuit precedent is in accord.  In *NLRB v. Oklahoma Fixture Co.*, 332 F.3d 1284, 1287 (10th Cir. 2003) (en banc), we noted that "it is not entirely clear exactly how the *Chevron* analysis is affected by the presence of criminal liability in a statute being

interpreted by an agency."  Nonetheless, we concluded that, under *Babbitt*, it was appropriate to give "some deference" under *Chevron* to the National Labor Relations Board's interpretation of an exception to a criminal prohibition on employer payments to labor organizations in the Labor Management Reporting Act.  *Id.* (noting that "the degree of deference may be dependent upon considerations of the agency's particular expertise and the policies implicated by the criminal statute in question, as well as the extent to which Congress has charged the agency with administering the criminal statute").  Accordingly, we looked at whether the agency's interpretation was "a reasonable or permissible one" and was "not in conflict with interpretive norms regarding criminal statutes."  *Id.* & n.5 (stating that "criminal statutes must be construed narrowly, and that exceptions to those statutes must be construed broadly").  We concluded that the agency's interpretation was reasonable and gave deference to its interpretation of the "criminal provision" at issue.[7]  *Id.* at 1287, 1291.  And contrary to Mr. Aposhian's assertion, the majority in *Oklahoma Fixture* did not apply, or even mention, the rule of lenity.  *See id.* at 1287–90.

We later gave deference under *Chevron* to a "reasonable" ATF regulation interpreting 18 U.S.C. § 922(g), despite the "criminal nature of that statute."  *United States v. Atandi*, 376 F.3d 1186, 1189 (10th Cir. 2004) (stating that "we unquestionably owe 'some deference' to the ATF's regulation") (quoting *Okla. Fixture*, 332 F.3d at

---

[7] Notably, in contrast with the regulation in *Babbitt* and the regulation at issue here, the NLRB's interpretation in *Oklahoma Fixture* carried *only* criminal implications. 332 F.3d at 1291 n.1. (Briscoe, J., concurring).

1286–87, and citing *Babbitt*, 515 U.S. at 703).  We emphasized that, as in this case, ATF

"had been delegated authority to implement" § 922 by virtue of 18 U.S.C. § 926(a), *id.*

(noting that § 926(a) "authoriz[es] 'such rules and regulations as are necessary to carry

out the provisions of this chapter'"), and we again did not invoke the rule of lenity.  *See*

*id.*[8]

    We once again gave deference under *Chevron* to an agency's interpretation of a

statute with criminal implications in *United States v. Hubenka*, 438 F.3d 1026, 1032–34

(10th Cir. 2006).  In *Hubenka*, a jury found the defendant guilty of violating the Clean

Water Act, and the defendant contended that "his activities . . . l[ay] beyond the reach of

the [statute]" as interpreted by the Army Corps of Engineers.  *Id.* at 1028.  We

nonetheless applied the *Chevron* framework and did not invoke the rule of lenity.  *Id.* at

1031 ("When a case involves an agency's interpretation of a statute it administers, this

court uses the two-step approach announced in *Chevron* . . . .").  We held that the Army

Corps of Engineers' "tributary rule [was] a permissible interpretation of the [statute]."

*Id.* at 1034.  Therefore, we stated that, "under *Chevron*, we must defer to the Corps'

interpretation of the statute" despite the criminal implications of the rule.  *Id.* at 1034

(affirming the defendant's conviction).  In sum, this court has repeatedly given agency

interpretations with criminal law implications deference.

---

[8] In *York v. Secretary of the Treasury*, 774 F.2d 417, 419 (10th Cir. 1985), we recognized ATF's "enforcement power" under 26 U.S.C. § 7805(a) "to interpret 26 U.S.C. § 5845(b)," the statute at issue in this case, "which provides that a 'machine gun' includes 'any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.'"

21

To be sure, the Supreme Court has recently "signaled some wariness about deferring to the government's interpretations of criminal statutes." *Guedes*, 920 F.3d at 25 (citing *Abramski*, 573 U.S. at 191, and *Apel*, 571 U.S. at 369). But as the D.C. Circuit explained in *Guedes*, those statements "were made outside the context of a *Chevron*-eligible interpretation." *Id.* Specifically,

> [i]n *Abramski*, the Court declined to extend deference to informal guidance documents published by [ATF]. *See* 573 U.S. at 191. And in *Apel*, the Court declined to defer to an interpretation contained in "Executive Branch documents" that were "not intended to be binding." 571 U.S. at 368. When directly faced with the question of *Chevron*'s applicability to an agency's interpretation of a statute with criminal applications through a *full-dress regulation*, the Court adhered to *Chevron*. *See Babbitt*, 515 U.S. at 704 n.18.

*Id.* (emphasis added). *Babbitt* and our court's precedents govern here, where ATF has promulgated a regulation through formal notice-and-comment proceedings. Under those precedents, Mr. Aposhian has failed to demonstrate a likelihood of success in establishing a rule against deference to agency interpretations with criminal law implications.

## B

Because the precedents cited call for the application of *Chevron*, we now examine the Final Rule under *Chevron*. We first ask whether the agency-administered statute is ambiguous on the "precise question at issue." *Chevron*, 467 U.S. at 842. If the statute's meaning is unambiguous, then we need go no further. If we find ambiguity, our caselaw instructs us to proceed to *Chevron*'s second step and ask whether the agency has provided a "permissible construction" of the statute. *Id.* at 843. There, "the task that confronts us is to decide, not whether [the agency's interpretation is] the best interpretation of the

22

statute, but whether it represents a reasonable one." *Atl. Mut. Ins. Co. v. Comm'r*, 523 U.S. 382, 389 (1998).

The NFA and GCA both define "machinegun" to mean "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see* 18 U.S.C. § 921(a)(23). The definition of "machinegun" also includes "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b).

The Final Rule determines that semiautomatic rifles equipped with bump stocks are "machineguns" because they "function[ ] as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds" through "a single pull of the trigger." Final Rule at 66,553. Applying *Chevron*, the statutory definition of "machinegun" is ambiguous, and ATF's interpretation is reasonable. Mr. Aposhian therefore is unlikely to succeed on the merits of his challenge to the Final Rule.

**(i)**

For the first step, to ascertain whether Congress clearly stated its intent on the precise statutory question at issue, courts should "apply[] the ordinary tools of statutory construction." *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). "These tools include examination of the statute's text, structure, purpose, history, and relationship to other statutes." *Harbert v. Healthcare Servs. Grp., Inc.*, 391 F.3d 1140, 1147 (10th Cir. 2004).

23

"Ambiguity is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). Under this analysis, we agree with the D.C. Circuit that two features of the statutory definition of "machinegun" render it ambiguous. The first is the phrase "single function of the trigger," and the second is the word "automatically." *Guedes*, 920 F.3d at 29.

*"Single Function of the Trigger"*

When applied to bump stocks, the statutory definition of machine gun is ambiguous with respect to the phrase "single function of the trigger." That is because, within the statutory context, the phrase can have more than one meaning. *See id.* ("[T]he statutory phrase 'single function of the trigger' admits of more than one interpretation."). Mr. Aposhian defines the phrase to mean a mechanical act of the trigger. Aplt. Br. at 26 (arguing that "[c]ourts have emphasized that a trigger's function is defined by how it mechanically operates, not by how the shooter engages it"). The government (and ATF), however, define "single function of the trigger" as "single pull of the trigger," Aple. Br. at 14, which "considers the external impetus for the mechanical process." *Gun Owners of Am. v. Barr*, 363 F. Supp. 3d 823, 832 (finding "the statutory definition of machine gun" to be "ambiguous with respect to the phrase 'single function of the trigger'").[9]

---

[9] The dissent states that ATF's interpretation of "single function of the trigger" to mean "single pull of the trigger" refers only to the action of the trigger and not the volitional action of the shooter. Dissent at 7. The parties argue otherwise. Specifically, Mr. Aposhian and the government agree that ATF's interpretation refers to the action of the shooter's trigger finger. *See* Aplt. Br. at 25 (arguing that the Final Rule conflicts with the statute because it redefines "single function of the trigger" to mean only the "deliberate and volitional act of the user pulling the trigger") (quotations omitted); Aple. Br. at 20 (arguing that the statute "is concerned with the *shooter's act* of pulling the

24

As the D.C. Circuit explained,

> The first interpretation would tend to exclude bump-stock devices: while a semiautomatic rifle outfitted with a bump stock enables a continuous, high-speed rate of fire, it does so by engendering a rapid bumping of the trigger against the shooter's stationary finger, such that each bullet is fired because of a distinct mechanical act of the trigger. The second interpretation would tend to include bump-stock devices: the shooter engages in a single pull of the trigger with her trigger finger, and that action, via the operation of the bump stock, yields a continuous stream of fire as long she keeps her finger stationary and does not release it.

*Guedes*, 920 F.3d at 29.

Within the statutory context, the phrase could have either meaning. The word "function" focuses on the "mode of action," 4 Oxford English Dictionary 602 (1933), or "natural . . . action," Webster's New International Dictionary 876 (1933), by which the trigger operates. But that definition begs the question of whether "function" requires our focus upon the movement of the trigger, or the movement of the trigger finger. The statute is silent in this regard. "In light of those competing, available interpretations, the statute contains a 'gap for the agency to fill.'" *Guedes*, 920 F.3d at 29 (quoting *Chevron*, 467 U.S. at 843).

Mr. Aposhian argues that "single function of the trigger" plainly means a mechanical movement of the trigger, asserting that Congress understood when it enacted

---

trigger") (emphasis added). Because the parties do not argue that ATF's interpretation refers to the action of the trigger, that argument is waived. *See Wyoming v. Livingston*, 443 F.3d 1211, 1216 (10th Cir. 2006). We acknowledge the parties' agreement on this issue, not to support our conclusion that the statute is ambiguous, but rather to explain why we do not address the argument that is the focus of the dissent.

25

the NFA that there was a "difference in the internal mechanism that allowed a machinegun to fire multiple rounds continuously with one function of the trigger and a semiautomatic weapon, which fires only one round with each function of the trigger." Aplt. Br. at 36. But this distinction in no way requires a "function" to be a mechanical action. In fact, the definition Congress gave to the term "semiautomatic rifle" in the GCA is "any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate *pull* of the trigger to fire each cartridge." 18 U.S.C. § 921(a)(28) (emphasis added). We conclude the statutory definition of machine gun is ambiguous with respect to the phrase "single function of the trigger."

*"Automatically"*

Similarly, the statutory term "automatically" is ambiguous when applied to bump stocks. In the statute, "automatically" functions as an adverb modifying the verb "shoots." Relying on definitions from the 1930s, the government and the Final Rule interpret the word to mean "the result of a self-acting or self-regulating mechanism." Final Rule at 66,519. Mr. Aposhian counters that because the shooter must maintain constant rearward pressure on the extension ledge with the trigger finger and constant forward pressure with the non-trigger hand for the bump stock to work, a bump stock cannot shoot "automatically." Aplt. Br. at 22–23. Essentially, "the parties' dispute is whether the . . . pressure exerted by the shooter . . . requires the conclusion that a bump stock does not shoot automatically." *Gun Owners*, 363 F. Supp. 3d at 831.

26

The statutory text does not answer this question.  The term "automatically,"
however, does not require there be *no* human involvement to give rise to "more than one
shot."  Webster's New International Dictionary provides that "automatically" is the
adverbial form of "automatic," meaning "[h]aving a self-acting or self-regulating
mechanism that performs a required act at a *predetermined point* in an operation."
Webster's New International Dictionary 187 (2d ed. 1934) (emphasis added); *see also*
Webster's New International Dictionary 156 (1933) (defining "automatic" as "self-acting
or self-regulating," especially applied to "machinery or devices which perform *parts* of
the work formerly or usually done by hand") (emphasis added).  Similarly, the Oxford
English Dictionary defines the term to mean "[s]elf-acting *under conditions fixed for it*,
going of itself."  1 Oxford English Dictionary 574 (1933) (emphasis added).  Therefore,
under its ordinary meaning, the term can be read to permit limited human involvement to
bring about "more than one shot."  As the D.C. Circuit explained,

> [A] quite common feature of weapons that indisputably
> qualify as machine guns is that they require both a single pull
> of the trigger *and* the application of constant and continuing
> pressure on the trigger after it is pulled.  We know, therefore,
> that the requirement of some measure of additional human
> input does not render a weapon nonautomatic.

*Guedes*, 920 F.3d at 30 (emphasis in original) (citation omitted).  But how much human
input is too much?  The statute does not say.

Mr. Aposhian cites *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994), for the
proposition that the shooter's manual manipulations of the weapon clearly do not meet
the definition of "automatically."  *See* Aplt. Br. at 18, 21.  Reliance on *Staples* is

misplaced. *Staples* concerned the necessary mens rea element for a conviction for possession of an unregistered machine gun under the NFA. 511 U.S. at 604. At the beginning of the opinion, the Court provided a footnote explaining how it was using certain terms in the opinion, including "automatic" and "semi-automatic." *Id.* at 602 n.1. It stated,

> [a]s used here, the terms "automatic" and "fully automatic" refer to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are "machineguns" within the meaning of the Act. We use the term "semiautomatic" to designate a weapon that fires only one shot with each pull of the trigger, and which *requires no manual manipulation* by the operator to place another round in the chamber after each round is fired.

*Id.* (emphasis added).

As the Seventh Circuit explained in *United States v. Olofson*, 563 F.3d 652, 657 (7th Cir. 2009), the statutory definition of these terms was not at issue in *Staples*, and the Court was not purporting to interpret the statute. Instead, "the Court simply was providing a glossary for terms frequently appearing in the opinion." *Id.* Moreover, the Court did not suggest that "automatic" firing excluded *all* "manual manipulation" of the gun, as Mr. Aposhian maintains. The Court mentioned "manual manipulation" only in connection with placing another round in the chamber. *Staples*, 511 U.S. at 602 n.1. Precluding "manual manipulation" to put another round in the chamber is not inconsistent with the statutory definition of a machine gun, which shoots more than one shot "without manual reloading," 26 U.S.C. § 5845(b).

28

In sum, the statutory definition of machine gun contains two central ambiguities, both of which ATF has attempted to resolve. Accordingly, we proceed to *Chevron*'s second step.

**(ii)**

When, as here, Congress leaves an implicit statutory gap, we ask at step two "whether the [regulation] is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. "'[T]he agency's interpretation need not be the only one it could have adopted, or the one that this court would have reached had the question initially arisen in a judicial proceeding.'" *Anderson v. Dep't of Labor*, 422 F.3d 1155, 1181 (10th Cir. 2005) (quoting *Salt Lake City v. W. Area Power Admin.*, 926 F.2d 974, 978 (10th Cir. 1991)).

ATF's interpretation of "single function of the trigger" to mean "single pull of the trigger" is a permissible reading of the statute. *See Guedes*, 920 F.3d at 31 (concluding ATF's interpretation of "single function of the trigger" is permissible); *Gun Owners*, 363 F. Supp. 3d at 832 (same). ATF's interpretation accords with how some courts have read the statute. For example, in *Akins*, the Eleventh Circuit held that ATF's reading of "single function of the trigger" to mean "single pull of the trigger" was "consonant with the statute and its legislative history." 312 F. App'x at 200 (concluding that the Akins Accelerator, a type of bump stock, was reasonably classified as a machine gun). In addition, the Final Rule's interpretation "accords with how the phrase 'single pull of the trigger' was understood at the time of the enactment of the [NFA]." *Guedes*, 920 F.3d at 31. The Final Rule cites a congressional hearing for the NFA where the then-president of

29

the National Rifle Association testified that the term "machine gun" included any firearm "capable of firing more than one shot by a single *pull* of the trigger, a single *function* of the trigger." Final Rule at 66,518 (emphasis added). Further, the House Report accompanying the bill that eventually became the NFA states that the bill "contains the usual definition of a machine gun as a weapon designed to shoot more than one shot . . . by a single *pull* of the trigger." H.R. Rep. No. 73-1780, at 2 (1934) (emphasis added).

Nonetheless, the dissent states that if the Final Rule does refer to the motion of the trigger finger—a proposition the parties do not dispute—then the regulation is invalid as being broader than the unambiguous NFA. Dissent at 8 n.3. This assertion is contrary to authority in this circuit. Specifically, this court has looked to a shooter's volitional actions to determine whether automation was obtained with a "single function of the trigger" under the NFA. *See United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977). In *Oakes*, we held that a "gun was a machine gun within the [NFA's] statutory definition" because "the *shooter* could, by fully *pulling* the trigger . . . obtain automation with a single trigger *function*." *Id.* (emphasis added). Thus, rather than being broader than the NFA, ATF's interpretation of "single function of the trigger" accords with how this court has interpreted the statute.

ATF's interpretation of "automatically" is likewise permissible. The Final Rule's "definition accords with the everyday understanding of the word 'automatic.'" *Guedes*, 920 F.3d at 31. That is, the bump stock "performs a required act at a predetermined point" in the firing sequence by directing the recoil energy into the space created by the sliding stock. The bump stock is also "self-acting under conditions fixed for it." The

30

shooter's positioning of the trigger finger on the extension ledge and application of forward pressure on the front of the gun provide the conditions necessary for the bump stock to repeatedly perform its purpose: to eliminate the need for the shooter to manually capture the recoil energy to fire additional rounds.  We therefore disagree with the dissent's contention that a bump stock cannot be "automatic" because it will not work without constant forward pressure.  Dissent at 12.  The bump stock performs *part* of the work usually done by hand at a predetermined point in the operation, under conditions fixed for it by the shooter.

In addition, ATF's interpretation focuses the inquiry about what needs to be automated precisely where the statute does: the ability of the trigger function to produce "more than one shot, without manual reloading."  26 U.S.C. § 5845(b); *see Guedes*, 920 F.3d at 31–32.  Further, ATF's interpretation tracks the interpretation reached by the Seventh Circuit, where the court interpreted the term to require a "self-acting mechanism" without requiring more.  *Olofson*, 563 F.3d at 658; *see also Guedes*, 920 F.3d at 32; *Gun Owners*, 363 F. Supp. 3d at 832 (holding that ATF's "interpretation [of the term 'automatically'] is consistent with judicial interpretations of the statute").

Because ATF's Final Rule sets forth a reasonable interpretation of the statute's ambiguous definition of "machinegun," it merits our deference.  Mr. Aposhian has not demonstrated a likelihood of success on the merits of his challenge to the Final Rule.

## IV

Although we could affirm the district court's denial of preliminary injunctive relief solely on the ground that Mr. Aposhian has failed to demonstrate a substantial

likelihood of success on the merits, we also conclude that Mr. Aposhian has not met the other prerequisites for preliminary relief.

*Irreparable Harm*

At the district court, "[t]he parties [did] not dispute that Mr. Aposhian will experience irreparable harm if the injunction is denied."  Aplt. App. at 175.  They did "disagree about what that irreparable harm is."  *Id.* at n.4.  Mr. Aposhian argued only that he would "be harmed by being forced to comply with a rule that has been promulgated in contravention of constitutional principles of separation-of-powers."  *Id.*  The government conceded only that the irreparable harm was the loss of Mr. Aposhian's bump stock.  *Id.*

On appeal, Mr. Aposhian again contends that he will suffer irreparable harm because the Final Rule was issued in violation of his constitutional rights—specifically, the separation of powers doctrine.  Aplt. Br. at 48.  The government now asserts that Mr. Aposhian will not suffer irreparable harm, contending that there is no support for the proposition that a generalized separation-of-powers violation constitutes irreparable harm.  Aple. Br. at 44.  We agree with the government that Mr. Aposhian has not met his burden of demonstrating irreparable harm.

Mr. Aposhian relies on our holding in *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019), where we held that "[w]hat makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial."  We noted that "[a]ny deprivation of any constitutional right fits that bill."  *Id.*  But in the merits portion of his opening brief, Mr. Aposhian does not cite to a single constitutional provision or rely on any constitutional theory to argue that the Final

32

Rule is invalid; rather, his arguments focus on whether the Final Rule contradicts the statute.[10]  We cannot conclude that Mr. Aposhian has shown irreparable harm based on the deprivation of a constitutional right when he does not even raise a constitutional challenge to the Final Rule in this court.

Even if Mr. Aposhian had properly raised a constitutional argument, he has not cited a single case where a generalized separation of powers, by itself, constituted irreparable harm.  To the contrary, our cases finding that a violation of a constitutional right alone constitutes irreparable harm are limited to cases involving individual rights, not the allocation of powers among the branches of government.  *See, e.g.*, *Free the Nipple*, 916 F.3d at 806 (alleged equal protection violation); *Awad v. Ziriax*, 670 F.3d 1111, 1119 (10th Cir. 2012) (alleged First Amendment violation); *see generally* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FED. PRAC. & PROC. § 2948.1 (3d ed. 2019) ("When an alleged deprivation of a constitutional right is involved, such as the *right to free speech or freedom of religion*, most courts hold that no further showing of irreparable harm is necessary.") (emphasis added).  For these reasons, he has not met his burden of demonstrating that he would suffer irreparable harm absent an injunction.

The dissent asserts that the government has waived any argument as to irreparable harm by conceding in the district court that Mr. Aposhian would suffer irreparable harm. Our precedent says otherwise.  For instance, in *Dominion*, the parties stipulated in a contract that a breach of an exclusivity provision would give rise to irreparable harm and

---

[10] As noted, the constitutional arguments Mr. Aposhian raised for the first time in a footnote in his reply brief are waived.  *Sylvia*, 875 F.3d at 1332 n.7.

warrant injunctive relief.  356 F.3d at 1261.  The district court relied solely on the parties'

stipulation to find that the plaintiff had met its burden of demonstrating irreparable harm.

*Id.* at 1266.  We reversed, concluding that the "stipulation without more is insufficient to

support an irreparable harm finding."  *Id.*  The same holds true here.

We emphasize that it is *Mr. Aposhian's* burden to demonstrate irreparable harm.

*Awad*, 670 F.3d at 1128 n.14 (noting that the plaintiff has the "burden under [each of] the

four preliminary injunction factors").  While the government stated in the district court

that the loss of Mr. Aposhian's bump stock would constitute irreparable harm, Mr.

Aposhian has never made a loss-of-property argument.  Therefore, he has waived this

argument and cannot rely on it to satisfy his burden.[11]

### Harm to the Government and the Public Interest

Mr. Aposhian has also failed to meet the remaining prerequisites for a preliminary

injunction.  Specifically, he has not shown that the threatened injury outweighs the harms

that the preliminary injunction will cause the government or that the injunction, if issued,

will not adversely affect the public interest.  These factors "merge" when the government

is the opposing party.  *Nken*, 556 U.S. at 435.

Mr. Aposhian argues that the "balance of equities" favors an injunction, stating

that the public interest weighs in his favor because the public has an interest in protecting

---

[11] In any event, we note that the loss of a bump stock cannot constitute irreparable harm because Mr. Aposhian could be awarded compensatory damages.  *See Salt Lake Tribune Pub. Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003) ("Irreparable harm, as the name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise.").

an individual's constitutional rights.  Aplt. Br. at 49–50.  But Mr. Aposhian has not argued that the Final Rule violates an *individual* constitutional right.  Moreover, the public has a strong interest in banning the possession and transfer of machine guns, including bump stocks.  The ban supports the safety of the public in general, *see* Final Rule at 66,515, and the safety of law enforcement officers and first responders, *id.* at 66,551.

Mr. Aposhian counters that because he is a law-abiding citizen, "ATF cannot plausibly suggest that public safety demands that he be deprived of his device any longer."  Aplt. Br. at 50.  The government's general public safety concerns, however, still apply to Mr. Aposhian.  Congress has prohibited Mr. Aposhian, no less than any other individual, from owning a bump stock.  *See Gun Owners*, 363 F. Supp. 3d at 834 ("Congress restricts access to machine guns because of the threat the weapons pose to public safety . . . All of the public is at risk, including the smaller number of bump stock owners.").  We conclude, and the dissent does not disagree, that Mr. Aposhian has failed to demonstrate that the threatened injury to him outweighs the harm that the preliminary injunction may cause to the government or that the injunction will not adversely affect the public interest.

## V

For the foregoing reasons, we affirm the district court's denial of a preliminary injunction.

35

*Aposhian v. Barr, et al.*, 19-4036

**CARSON,** J., dissenting.

In our Republic, Congress has the power to make and change laws.  U.S. Const. art. I.  Yet that preferred route often takes a back seat to a more expedient one.  As is now often the case, the Executive Branch steps in and seeks to remedy an unpopular or poorly drafted law through an administrative regulation.  And to be sure, the Executive can do so when the law is ambiguous; the Supreme Court has made as much clear.  Chevron, U.S.A., Inc. v. Nat. Res. Def. Counsel, 467 U.S. 837 (1984).

But regardless of the Executive's ability to repair ambiguous laws, *unambiguous* laws—no matter how problematic or out of favor—are out of its reach.  See Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1630 (2018) (explaining that Chevron deference is unwarranted when "traditional tool[s] of statutory construction" are "up to the job of solving [a statute's] interpretive puzzle"); Big Horn Coal Co. v. Sadler, 924 F.3d 1317, 1322 (10th Cir. 2019) ("[I]f Congress has spoken 'directly' to the 'precise question at issue,' the inquiry ends, and we must give effect to the express intent of Congress." (quoting Chevron, 476 U.S. at 842)).  Thus, when a party challenges a regulation that implements an unambiguous law in court, the Judiciary must be mindful that neither it nor the Executive has the power to make the law.  See Sessions v. Dimaya, 138 S. Ct. 1204, 1228 (2018) (Gorsuch, J., concurring).  Rather, those two branches "must respect the role of the Legislature, and take care not to undo what it has done."  King v. Burwell, 135 S. Ct. 2480, 2496 (2015).  In short, Congress must fix any flaw that may exist in a

particular piece of unambiguous legislation; the Executive and the Judiciary may not do so no matter how tempting the fix may be.

Today we encounter an example of unambiguous legislation that neither the Executive nor the Judiciary may cast asunder: the National Firearms Act (NFA), 26 U.S.C. §§ 5801–72.  As the majority notes, that law regulates "machinegun[s]," which comprise "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b).  That clear language leaves little wiggle room.  The word "automatically," for instance, takes on its usual definition and refers to mechanisms that are "self-acting or self-regulating" rather than mechanisms that are *not* self-acting or self-regulating.  And the phrase "single function of the trigger" speaks only about the trigger itself; the phrase mentions nothing about the external stimulus that interacts with the trigger.  Thus, to qualify as a machine gun under the NFA, a firearm must satisfy at least two conditions: (1) the *trigger itself* must "function" only once to fire more than one shot, and (2) the *mechanism that allows the trigger* to "function" only once must be "self-acting or self-regulating."

As I explain below, a semiautomatic firearm equipped with a bump stock satisfies neither of those conditions.  For one thing, the trigger on such a firearm must still "function" every time a shot is fired.  And in any event, the bump stock—at least the nonmechanical variety—is not "self-acting or self-regulating" on the trigger.  Why?  Because the user of the firearm *must also* apply constant forward pressure with his or her

2

nontrigger hand for the bump stock to work.[1]  So does a bump stock increase the speed by which the user can fire rounds?  Yes.  But does that mean the firearm to which it is attached is a machine gun under the NFA?  No.

Yet the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) now thinks so.  In the wake of the tragic Las Vegas shooting, ATF promulgated a final administrative rule in late 2018 that classifies "bump-stock-type devices" as "machinegun[s]" under the NFA.  See Bump-Stock-Type Devices, 83 Fed. Reg. 66,514 (Dec. 26, 2018) (the Bump-Stock Rule).  ATF declared that a machine gun includes

> a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

Id. at 66,553–54.

That rule cannot withstand judicial scrutiny.  As applied, the Bump-Stock Rule focuses on the user's trigger finger instead of the trigger itself, which flouts the phrase "single function *of the trigger*" in the NFA.  26 U.S.C. § 5845(b) (emphasis added).  The Bump-Stock Rule also fails to consider that the user must apply constant forward pressure with his or her nontrigger hand (a task that requires a fair amount of strength and dexterity) to make the bump stock work, which runs afoul of the word "automatically" in the NFA.  Our inquiry should begin and end with that straightforward statutory analysis.

---

[1] Mechanical bump stocks use slightly different mechanisms.  The Akins Accelerator, for instance, uses internal springs instead of constant forward pressure to propel the firearm forward.

3

I therefore must respectfully dissent from the majority's conclusion that the NFA's definition of a machine gun is ambiguous as applied to bump stocks and that we must uphold the Bump-Stock Rule through <u>Chevron</u> deference. Neither the Judiciary nor the Executive has the power to make or change law by creating an ambiguity where none exists. To do so (as both ATF did and the majority does today) subverts the constitutional prerogatives of each branch of government.

To be clear: I express no opinion on whether the Second Amendment protects bump stocks, nor do I express an opinion about whether any American citizen even has a valid reason to own a bump stock. Neither of those inquiries is before us today, and I do not base my dissent on any personal convictions about how a court should answer them. Rather, I dissent simply because the unambiguous language of the NFA establishes that Plaintiff W. Clark Aposhian is likely to succeed on the merits of his challenge to the Bump-Stock Rule. And in any event, even if the NFA's language *were* ambiguous, I cannot endorse the majority's decision to uphold the Bump-Stock Rule through <u>Chevron</u> deference. Applying <u>Chevron</u> is misguided for two distinct reasons: ATF disavowed that doctrine in its briefing, and the definition of "machinegun" in the NFA carries criminal consequences. Finally, ATF waived its argument that Plaintiff will not suffer any irreparable harm, which simply bolsters the conclusion that Plaintiff is entitled to preliminary injunctive relief.[2]

---

[2] The majority relies on the reasoning in the D.C. Circuit's opinion in <u>Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives</u>, 920 F.3d 1 (D.C. Cir. 2019), <u>cert. denied</u>, 140 S. Ct. 789 (2020). I agree with Judge Henderson's thoughtful and well-crafted partial dissent in that case.

4

I.

Consider again how a nonmechanical bump stock operates. The bump stock replaces the standard stock of a rifle—the part of the gun that rests against a shooter's shoulder. A shooter pulls the trigger. The kickback or recoil causes the gun to slide backward. The shooter keeps his or her trigger finger stationary, maintaining backward pressure on the trigger. At the same time, the shooter must also apply forward pressure with his or her non-shooting hand. This process of forward pressure with one hand and backward pressure with the other causes the firearm to slide back and forth rapidly, which bumps the stationary finger against the moving trigger. The result: the trigger resets rapidly, which causes the rifle to fire many shots over a short time. Bump-Stock Type Devices, 83 Fed. Reg. at 66,516.

ATF believes that process transforms a firearm into a weapon that shoots more than one shot "automatically . . . by a single function of the trigger." 26 U.S.C. § 5845(b). To get there, ATF first clarified in the Bump-Stock Rule that the word "automatically" means "functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger." Bump-Stock-Type Devices, 83 Fed. Reg. at 66,553; see also 27 C.F.R. § 447.11. It next clarified that the phrase "single function of the trigger" means "single pull of the trigger and analogous motions." Bump-Stock-Type Devices, 83 Fed. Reg. at 66,553; see also 27 C.F.R. § 447.11. And it finally concluded that those clarifying definitions cover bump stocks:

5

> [W]hen a shooter who has affixed a bump-stock-type device to a semiautomatic firearm pulls the trigger, that movement initiates a firing sequence that produces more than one shot. And *that firing sequence is "automatic"* because the device harnesses the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing *after a single pull of the trigger*, so long as the trigger finger remains stationary on the device's ledge (as designed).

Bump-Stock-Type Devices, 83 Fed. Reg. at 66,519 (emphases added).

I take no issue with ATF's definitions that clarify the meanings of "automatically" and "single function of the trigger." But as I explain below, *applying* those definitions to nonmechanical bump stocks cannot lead to ATF's preferred result. I discuss each in turn.

### A.

I begin with the phrase "single function of the trigger." As mentioned, the Bump-Stock Rule defines that phrase to mean "a single pull of the trigger and analogous motions." 27 C.F.R. § 447.11. When one dissects that language, the reason it cannot apply to bump stocks becomes apparent.

To start, I agree with the majority that the word "function" means "action." Webster's New International Dictionary 876 (1933). That much is clear. But I part ways with the majority when it concludes that the "statute is silent" (and therefore ambiguous) as to whether that action centers on "the movement of the trigger, or the movement of the trigger finger."

In fact, the statute speaks clearly: the function/action must be "of the trigger." The NFA mentions *nothing* about trigger finger or any other "external impetus" that happens to interact with the trigger. Guedes v. Bur. of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d 1, 43 (D.C. Cir. 2019) (Henderson, J., concurring in part and dissenting in part)

6

(observing that the word "function" in the NFA "focus[es] on how the trigger acts"). And given that omission, we must presume "that [the] legislature says . . . what it means and means . . . what it says"—that is, we must presume that the function/action of the trigger itself is the only variable that matters.  Henson v. Santander Consumer USA Inc., 137 S. Ct. 1718, 1725 (2017) (alterations in original) (quoting Dodd v. United States, 545 U.S. 353, 357 (2005)).  By concluding otherwise and allowing an inquiry into the trigger *finger*, the majority effectively "replac[es] the actual text" of the NFA "with speculation as to Congress' intent."  Magwood v. Patterson, 561 U.S. 320, 334 (2010).  That the majority cannot do without taking on a legislative role.  As a result, Congress's use of the phrase "single function of the trigger" in the NFA can mean *only* "single action of the trigger" and *not* "single action of the trigger finger."  The clear language ties our hands.

Necessarily, then, ATF's *interpretation* of the phrase "single function of the trigger"—i.e., "single pull of the trigger and analogous motions"—can refer *only* to the action of the trigger and *not* the trigger finger.  See Guedes, 920 F.3d at 43 (D.C. Cir. 2019) (Henderson, J., concurring in part and dissenting in part) ("[N]othing in the [Bump-Stock] Rule's definition refers to a shooter's finger or a volitional action.").  That is the only way for ATF's interpretation to remain valid.  Otherwise, ATF's interpretation would contradict the unambiguous NFA—the interpretation would refer to the trigger finger, while the statute refers to the trigger alone—and "[a] regulation in conflict with

7

the terms of an unambiguous statute will not be sustained."  <u>Burnet v. Marston</u>, 57 F.2d

611, 612 (D.C. Cir. 1932).[3]

That limitation on the phrase "single pull of the trigger and analogous motions"

sounds the death knell for ATF's new take on bump stocks.  For as I alluded to above, a

semiautomatic rifle equipped with a bump stock simply does *not* use a single function of

the trigger to fire more than one shot.

To illustrate, first consider the basic mechanics of a semiautomatic rifle that lacks

a bump stock.  The trigger on that type of rifle must necessarily "pull" backwards and

release the rifle's hammer—the part of a rifle that sets in motion how the bullet leaves the

barrel—every time that the rifle discharges.  <u>See</u> Plaintiff-Appellant's App'x A73–A74.

The rifle cannot fire a second round until both the trigger and hammer reset.  Only then

can the trigger "pull" backwards once more and reinitiate the entire firing process from

the beginning.

A bump stock cannot change that process.  The trigger on a semiautomatic rifle

equipped with a bump stock still pulls backwards every time that the rifle fires.  The only

difference is that recoil—not the operator's finger—causes that pull.  <u>See</u> <u>Guedes</u>, 920

---

[3] The majority points out that the parties agree that ATF's interpretation refers to the action of the shooter's trigger finger.  But that agreement does not help the majority in any way.  Again, if the regulation *does* refer to the motion of the trigger finger, the regulation is invalid because it conflicts with the unambiguous NFA.  <u>Burnet</u>, 57 F.2d at 612 ("While the [agency] was clothed with authority to promulgate regulations, [it] was not authorized to add to or take from the plain language of the statute, for, 'where the intent is plain, nothing is left to construction.'" (quoting <u>United States v. Fisher</u>, 6 U.S. (2 Cranch) 358, 386 (1805)).  I simply choose to give the regulation the benefit of the doubt.

8

F.3d at 48 (Henderson, J., concurring in part and dissenting in part) ("A semiautomatic rifle shoots a single round per pull of the trigger and the bump stock changes only *how* the pull is accomplished." (emphasis in original)).  Again, the NFA demands that we look only to how the trigger acts.  And given that the trigger functions every time a semiautomatic rifle equipped with a bump stock fires a round, such a rifle unambiguously cannot be a machine gun under the NFA *even if* the operator's trigger finger remains stationary.

Contrasting a bump-stock-equipped rifle with the machine gun that the majority references from our decision in United States v. Oakes, 564 F.2d 384 (10th Cir. 1977), reinforces my point.  The gun in Oakes contained two "projections" in the area that a traditional trigger usually occupies.  Id. at 388.  The first was a "forward" projection "curved so as to fit the finger in a normal fashion"—in other words, it looked like and functioned as a regular trigger.  Id.  The second projection was "seated behind" the forward one and "curved in a manner so that at its extremity it would be pushed if the [shooter fully pulled the forward projection] to contact."  Id.  In sum, when the shooter fully pulled the first projection/trigger, the second projection activated and "fully automated the gun."  Id.

The question in Oakes was whether that interplay between the two projections allowed the gun to fire more than one shot "by a single function of the trigger"; the government argued it did, while the gun owner argued that the gun's "two triggers" meant it did not.  Id. at 387 n.2, 388.  Contra the majority's suggestion today, the ultimate answer to that question did not hinge on the shooter's volitional actions in any way.

9

Indeed, the holding of Oakes that the weapon fit the bill of a machine gun under the NFA boiled down to the fact that "fully pulling the trigger"—that is, the forward projection—allowed the gun to automatically fire rounds. Id. at 388. That rationale endures even if one focuses on the shooter's trigger finger or the trigger itself: both the finger and the trigger on such a gun "pulled" just once to fire more than one round even though a second, posterior projection factored into the weapon's automatic mechanism. See id. We should thus draw little guidance from the language in Oakes that speaks in terms of the shooter's actions rather than the trigger's actions. The distinction between the two concepts made no difference to the holding, so that specific language in Oakes is no more than imprecise dicta. Tokoph v. United States, 774 F.3d 1300, 1303 (10th Cir. 2014) ("[A] panel of this court is bound by a *holding* of a prior panel of this court but is not bound by a prior panel's *dicta.*" (alteration and emphasis in original) (quoting Bates v. Dep't of Corr., 81 F.3d 1008, 1011 (10th Cir. 1996))).

Viewed under that lens, Oakes supports my position. That case tracks the text of the NFA: it does not defy the congressional determination that the trigger itself must function just once to fire more than one shot. As I explain above, however, a rifle equipped with a bump stock does not fit that rubric. That type of rifle continues to use multiple functions of the trigger itself even though the shooter must take only a single volitional action. A bump stock, in other words, changes only *how* a trigger pulls; it does not change the fact that the trigger itself *must* function every shot. Under the unambiguous language of the NFA, that means that a bump stock cannot transform a semiautomatic rifle into a machine gun.

10

B.

The word "automatically" in the NFA unearths an even-more-obvious flaw in the ATF's bump-stock ban.

As a reminder, I take no issue with the ATF's interpretation of that word—i.e., "functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger."  27 C.F.R. § 447.11. That interpretation "reflects the ordinary meaning of that term at the time of the NFA's enactment in 1934," and that same ordinary meaning continues to this day.  Bump-Stock-Type Devices, 83 Fed Reg. at 66,519; see also Webster's New International Dictionary 187 (2d ed. 1934) (defining "automatic" as "[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation"); Automatic, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/automatic (last visited Mar. 30, 2020) (defining "automatic" as "having a self-acting or self-regulating mechanism").

The problem is again one of application.  A nonmechanical bump stock is not a "self-acting or self-regulating mechanism"; the constant forward pressure that the shooter must apply with his or her nontrigger hand prevents that label.[4]

---

[4] In her dissent, Judge Henderson *does* question the ATF's actual interpretation of the word "automatically."  See Guedes, 920 F.3d at 42 (Henderson, J., concurring in part and dissenting in part) ("Although the [Bump-Stock] Rule . . . correctly interprets 'single function of the trigger,' it misreads 'automatically.'").  But her reasons for that belief also stem from the constant forward pressure that the shooter must apply with his or her nontrigger hand.  Id. at 43–45.  Thus, no matter if the interpretation or application of the word "automatically" is the ultimate problem, the important point is that the "extra"

11

In coming to this conclusion, I do no more and no less than take the words "self-acting" and "self-regulating" at face value. If a mechanism is self-acting, it acts by itself. If it is self-regulating, it regulates itself. A nonmechanical bump stock does neither. By design, that type of bump stock *requires* manual human input—constant forward pressure with the nontrigger hand—to act. And it *requires* that same manual human input to regulate its actions. Without the constant forward pressure, a nonmechanical bump stock simply will not work; the firearm to which it is attached will fire only one shot even with the stationary trigger finger applying constant backward pressure. A nonmechanical bump stock is therefore not "*self*-acting" or "*self*-regulating."

That straightforward logic also highlights the flaws underlying the majority's attempt at fashioning an ambiguity from the word "automatically." Again, the terms "self-acting" and "self-regulating" are self-explanatory—they exclude *any* manual human involvement by their very definitions. So the majority is simply wrong when it says that the NFA is ambiguous by failing to delineate the precise amount of necessary human input. The ordinary, dictionary definition of "automatically" makes the answer clear: none.

The D.C. Circuit tried to make the majority's exact point by example. It observed, for instance, that even automatic weapons "require both a single pull of the trigger *and* the application of constant and continuing pressure on the trigger after it is pulled." Guedes, 920 F.3d at 30 (majority opinion) (emphasis in original). It also analogized an

---

physical input from the nontrigger hand prevents us from classifying nonmechanical bump-stock-type devices as machine guns.

12

automatic firearm to an automatic sewing machine that "requires the user to press a pedal *and* direct the fabric." Id. (emphasis in original). Because these automatic devices require *some* human interaction, the D.C. Circuit posited that the word "automatically" remains ambiguous as to the precise amount of human input that word permits.

But examples such as these only prove my ultimate point. Unlike a nonmechanical bump stock, the human involvement in a fully automatic firearm and an automatic sewing machine is not a part of their *mechanisms themselves*. Instead, the involvement is in some way extrinsic to their actual mechanisms. And that makes all the difference, because the terms "self-acting" and "self-regulating" *only* modify the word "mechanism." See 27 C.F.R. § 447.11 ("[T]he term 'automatically' . . . means functioning as the result of a *self-acting or self-regulating mechanism . . . .*" (emphasis added)). The continued pressure on the trigger of an automatic firearm, for example, is not part of the internal mechanism that keeps feeding cartridges into and ejecting cartridges out of the firearm's chamber at a rapid pace. The constant pedal-pressure on an automatic sewing machine is the same way: although that pressure keeps the automatic process going, the pressure is not itself part of the engineered mechanism that forces the needle to bob up and down. Directing the fabric through an automatic sewing machine is an even clearer example, because even if the sewer stops feeding fabric, the automatic mechanism can continue to operate.

By contrast, nonmechanical bump stocks require manual human involvement at all times as part of their underlying mechanisms. As I've previously explained, these types of bump stocks increase a user's firing rate through recoil. And recoil is impossible

13

without constant forward pressure from the user's nontrigger hand.  The former hinges on the latter: no manual human input, no recoil.  In other words, manual human input is a necessary element of a nonmechanical bump stock's actual mechanism, which separates this type of bump stock from the examples that the D.C. Circuit put forth.

For all of these reasons, a nonmechanical bump stock is not a "self-acting or self-regulating mechanism."  And because it is not self-acting or self-regulating, the firearm to which it is attached is unambiguously not one that shoots "automatically."

C.

In sum, both the word "automatically" and the phrase "single function of the trigger" in the NFA are unambiguous as applied to nonmechanical bump stocks.  Plaintiff is thus likely to succeed on the merits of his challenge to the Bump-Stock Rule.

II.

Because the NFA's terms are unambiguous, the majority inappropriately applied Chevron deference to the Bump-Stock Rule.  But even if that statute were ambiguous, at least two other reasons counsel against applying Chevron.

First, the government explicitly disavowed any reliance on Chevron.  That alone should have prevented the majority from applying the controversial doctrine.  As Justice Gorsuch recently observed in another case about the Bump-Stock Rule, "[i]f the justification for Chevron is that 'policy choices' should be left to executive branch officials 'directly accountable to the people,' then courts must equally respect the Executive's decision *not* to make policy choices in the interpretation of Congress's handiwork."  Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 140 S. Ct.

14

789, 790 (2020) (statement of Gorsuch, J., respecting denial of certiorari) (emphasis in original) (quoting Epic Sys. Corp., 138 S. Ct. at 1630).  By doing the exact opposite—that is, turning a blind eye to the government's request and applying Chevron anyway—the majority "place[s] an uninvited thumb on the scale in favor of the government."  Id. (statement of Gorsuch, J., respecting denial of certiorari).  That concerns me, especially given that both the Supreme Court and our Circuit have "often declined to apply Chevron deference when the government fails to invoke it" or otherwise rely on it.  Id. (statement of Gorsuch, J., respecting denial of certiorari); see also, e.g., Hays Med. Ctr. v. Azar, — F.3d —, No. 17-3232, 2020 WL 1922595, at *13 n.18 (10th Cir. Apr. 21, 2020); Hydro Res., Inc. v. EPA, 608 F.3d 1131, 1146 (10th Cir. 2010).  If any of our precedent holds otherwise, see, e.g., TransAm Trucking, Inc. v. Admin. Review Bd., 833 F.3d 1206, 1212 n.4 (10th Cir. 2016), perhaps the day will soon come when the Supreme Court definitively overrules it.

Second, because the definition of "machinegun" in the NFA "carries the possibility of criminal sanctions," Chevron is likewise inapplicable.  Guedes, 140 S. Ct. at 790 (statement of Gorsuch, J., respecting denial of certiorari); see also 18 U.S.C. § 922(o)(1) ("[I]t shall be unlawful for any person to transfer or possess a machinegun."); 18 U.S.C. § 921(a)(23) ("The term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act.").  I need not belabor the point; many other jurists have written about this concern in great detail.  See, e.g., Guedes, 140 S. Ct. at 790 (statement of Gorsuch, J., respecting denial of certiorari); Guedes, 920 F.3d at 39–42 (Henderson, J., concurring in part and dissenting in part); Gutierrez-Brizuela v. Lynch,

15

834 F.3d 1142, 1155–57 (10th Cir. 2016) (Gorsuch, J., concurring); <u>Esquivel-Quintana v.</u>

<u>Lynch</u>, 810 F.3d 1019, 1027–32 (6th Cir. 2016) (Sutton, J., concurring in part and

dissenting in part), <u>rev'd on other grounds sub nom.</u> Esquivel-Quintana v. Sessions, 137

S. Ct. 1562 (2017).  Suffice to say that when, as here, a law carries both civil and

criminal consequences, applying <u>Chevron</u> can lead to troubling and unintended outcomes.

After all, "[b]ecause a single law should have a single meaning, the 'lowest common

denominator'—including all rules applicable to the interpretation of criminal laws—

governs all of its applications."  <u>Esquivel-Quintana</u>, 810 F.3d at 1028 (Sutton, J.,

concurring in part and dissenting in part) (quoting <u>Clark v. Martinez</u>, 543 U.S. 371, 380

(2005)).  That approach is the only way to ensure that the law takes on "the least liberty-

infringing interpretation."  <u>Id.</u>  Thus, since "[t]he Supreme Court has expressly instructed

us *not* to apply Chevron deference when an agency seeks to interpret a criminal statute,"

<u>Gutierrez-Brizuela</u>, 834 F.3d at 1155 (Gorsuch, J., concurring) (emphasis in original), the

logical result is that we must also not apply <u>Chevron</u> when a statute has both civil and

criminal applications.

      With that said, the majority correctly observes that, more than once, we have given

at least *some* deference to an agency's interpretation of a statute carrying criminal

repercussions.  <u>See, e.g.</u>, <u>United States v. Hubenka</u>, 438 F.3d 1026, 1032–34 (10th Cir.

2006); <u>United States v. Atandi</u>, 376 F.3d 1186, 1189 (10th Cir. 2004); <u>NLRB v. Okla.</u>

<u>Fixture Co.</u>, 332 F.3d 1284, 1287 (10th Cir. 2003) (en banc).  And despite the Supreme

Court's recent guidance condemning <u>Chevron</u> in the criminal sphere, some courts (like the

majority today) believe that the Supreme Court's language in an earlier case muddies the

16

waters.  Compare Abramski v. United States, 573 U.S. 169, 191 (2014) ("[C]riminal laws are for courts, not for the Government, to construe."), and United States v. Apel, 571 U.S. 359, 369 (2014) ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference."), with Babbitt v. Sweet Home Chapter of Cmties. for a Great Or., 515 U.S. 687, 703–04 & n.18 (1995) ("[W]e owe some degree of deference to [the agency's] reasonable interpretation" of a "statute [that] includes criminal penalties.").  See also Guedes, 920 F.3d at 25 (majority opinion) (drawing fine lines between Abramski, Apel, and Babbitt to give Chevron a foothold when a statute carrying criminal repercussions is at play).

Against this backdrop, my hope is that the Supreme Court will one day take up this issue to give us clear guidance for future cases.  Whatever the benefits of Chevron are, none come to mind by forcing courts to expand the doctrine to statutes that bring about dual civil and criminal consequences.

## III.

As a final point, I disagree with the majority's conclusion that Plaintiff has not met his burden of proving that he would suffer irreparable harm absent an injunction.  My reason is simple: the government conceded outright in the district court that Plaintiff would suffer irreparable harm by complying with the regulation.  When a party intentionally relinquishes or abandons a theory in the district court, "we usually deem it waived and refuse to consider it" on appeal.  Richison v. Ernest Group, Inc., 634 F.3d 1123, 1127 (10th Cir. 2011).  We should follow that rule; hold the government to its

17

intentional waiver; and conclude that Plaintiff, given that waiver, has met his burden of establishing irreparable harm.

The majority retorts that our decision in <u>Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.</u>, 356 F.3d 1256 (10th Cir. 2004), forbids that conclusion. The majority is mistaken. True enough, we held in <u>Dominion</u> that a party moving for a preliminary injunction could not establish irreparable harm simply by invoking a contractual stipulation to that fact. <u>Id.</u> at 1261, 1266. Even so, the opposing party in <u>Dominion</u> had argued in the district court that the question of irreparable harm should not hinge on the contractual stipulation alone. <u>See, e.g.</u>, <u>id.</u> at 1261 (observing that the district court, "[i]n making its irreparable harm determination," rejected some of the moving party's arguments "[b]ased on evidence presented by" the opposing party); <u>id.</u> (noting the district court's belief that the opposing party's expert witnesses "persuasively demonstrated" the moving party would suffer a quantifiable loss). And therein lies the pivotal difference between <u>Dominion</u> in our case today: the opposing party in <u>Dominion</u> never intentionally waived its position on irreparable harm in court, while the opposing party in our case (ATF) *did* waive its position in court. A prelitigation stipulation that a party later challenges once the conflict comes to a head is far different than conceding an element of a claim to a judge. In short, the majority compares apples and oranges.

At bottom, the majority's position means that a party with the burden of proof cannot overcome its burden by pointing out that the opposing party conceded an element of the claim in court. As one would expect, that alarming consequence skirts circuit precedent. <u>See, e.g.</u>, <u>Johnson v. Spencer</u>, 950 F.3d 680, 708 (10th Cir. 2020) (concluding

18

that defendants who had relied on claim preclusion as a defense met their burden of proof on two of the three requisite elements because the opposing party "concede[d] . . . the second and third elements"); United States v. Sinks, 473 F.3d 1315, 1321 (10th Cir. 2007) (observing that the government can concede elements of the plain error standard of review, which a criminal defendant has the burden of proof to establish). And given that precedent (and, for that matter, common judicial practice), the fact that Plaintiff and ATF had different views in the district court about the *type* of irreparable harm at issue is irrelevant. Because ATF conceded point blank that Plaintiff would suffer *some* irreparable harm—one of the four elements of any preliminary injunction—Plaintiff's failure to correctly identify the exact parameters of that harm has no legal effect.[5]

The majority thus fails to posit a defensible reason for rewarding ATF's about-face on appeal. And I myself cannot think of any good reason to do so when strong counterarguments—for example, that bump stocks are unique pieces of property, that the Bump-Stock Rule can lead to criminal consequences, and so on—suggest that ATF would (or at least should) lose on the irreparable-harm element in any event. I would

---

[5] The same logic applies to the majority's argument that a court's ability to award Plaintiff compensatory damages for his bump stock precludes his harm from being irreparable. Even if the majority is correct—and I am not convinced it is, especially given that ATF has argued in at least one other case that bump stock owners are ineligible for compensation, Lane v. United States, No. 3:19-CV-01492-X, 2020 WL 1513470, at *1 (N.D. Tex. Mar. 30, 2020)—that nuance makes no difference today. Again, because ATF conceded irreparable harm, Plaintiff's purported ability to receive compensatory damages does not matter.

19

therefore hold ATF to its intentional waiver and conclude that Plaintiff will suffer

irreparable harm from the Bump-Stock Rule.[6]

IV.

For all these reasons, I would reverse the district court's denial of a preliminary

injunction.  I respectfully dissent.

---

[6] Absent waiver, I agree that Plaintiff cannot use our holding in Free the Nipple-Fort Collins v. City of Fort Collins, 916 F.3d 792 (10th Cir. 2019), that "[a]ny deprivation of any constitutional right" amounts to irreparable harm.  Id. at 806.  Plaintiff makes no constitutional arguments today (he only makes statutory and administrative arguments), so the language from Free the Nipple goes nowhere from the start.  With that said, in an appropriate case, we should consider revisiting (or at least limiting) that specific holding from Free the Nipple.  Allowing *any* deprivation of *any* constitutional right to serve as per se irreparable harm is a far-too-powerful tool in most cases.

20